# In the Iowa Supreme Court

No. 24–0261

Submitted February 18, 2025—Filed June 27, 2025
Amended September 4, 2025

**State of Iowa,**

Appellee,

vs.

**Kevin Dwayne Woods, Jr.,**

Appellant.

Appeal from the Iowa District Court for Polk County, Gregory D. Brandt, judge.

A criminal defendant challenges his conviction under Iowa Code section 724.8B (2023), arguing that the conviction violates the Second Amendment to the United States Constitution and article I, section 1A of the Iowa Constitution. **Affirmed.**

McDonald, J., delivered the opinion of the court, in which Christensen, C.J., and Mansfield, J., joined. Oxley, J., filed an opinion concurring in the judgment. McDermott, J., filed a dissenting opinion, in which Waterman and May, JJ., joined. May, J., filed a dissenting opinion, in which Waterman and McDermott, JJ., joined.

Jessica Donels (argued) and Kyle Dawson of Parrish Kruidenier, L.L.P., Des Moines, for appellant.

Brenna Bird, Attorney General, and Olivia D. Brooks (argued), Assistant Attorney General, for appellee.

**McDonald, Justice.**

During a traffic stop, Kevin Woods was found to be in possession of drugs, a scale, a loaded semiautomatic pistol, and additional high-capacity firearm magazines. He was charged with and pleaded guilty to (1) possession of a controlled substance and (2) carrying a dangerous weapon while in the illegal possession of a controlled substance or while committing an indictable offense. Woods challenges the latter conviction in this appeal. He argues that he has a federal and state constitutional right to carry a firearm while simultaneously in the illegal possession of a controlled substance and while committing an indictable offense. We disagree. There is no federal or state constitutional right to carry a firearm while criming.

I.

An officer pulled Kevin Woods over for having inoperable taillights on the trailer of the commercial vehicle he was driving. During the stop, the officer detected the odor of marijuana emanating from inside the vehicle, and the officer saw in plain view a THC vape pen on the center console. Having probable cause to believe a crime was being committed, the officer conducted a search of the vehicle, including a backpack on the center console. The officer found marijuana and a scale inside the backpack. Also in the backpack with the drugs and the scale was a nine-millimeter semiautomatic pistol with a loaded magazine in the magazine well. In addition to the drugs, the scale, and the loaded pistol, the officer found three additional magazines, two of which were loaded, and two of which were high-capacity. In total, the officer found sixty-eight rounds of ammunition.

Woods was charged with possession of a controlled substance, a serious misdemeanor, in violation of Iowa Code section 124.401(5) (2023), and carrying

a dangerous weapon while in the illegal possession of a controlled substance or while committing an indictable offense, a serious misdemeanor, in violation of Iowa Code section 724.8B. Iowa Code section 724.8B provides as follows:

> A person determined to be ineligible to receive a permit to carry weapons under section 724.8, subsection 2, 3, 4, 5, or 6, a person who illegally possesses a controlled substance included in chapter 124, subchapter II, or a person who is committing an indictable offense is prohibited from carrying dangerous weapons. Unless otherwise provided by law, a person who violates this section commits a serious misdemeanor.

A pistol is a dangerous weapon within the meaning of the statute. *Id.* § 702.7.

Woods moved to dismiss the dangerous weapon charge on the ground that prosecution of the case would violate his federal constitutional right to keep and bear arms, as protected by the Second and Fourteenth Amendments to the United States Constitution, and his state constitutional right to keep and bear arms, as protected by article I, section 1A of the Iowa Constitution. The district court denied the motion to dismiss. It reasoned that the legislature could place reasonable time, place, and manner restrictions on the right to keep and bear arms. It concluded that the prohibition on carrying firearms while illegally possessing a controlled substance or committing an indictable offense was a reasonable time, place, and manner regulation supported by historical analogues.[1]

After the district court denied Woods's motion to dismiss, Woods entered a conditional guilty plea to both charges, preserving his right to challenge the

---

[1]In the district court, Woods also claimed that a conviction under section 724.8B would deprive him of his fundamental right to keep and bear arms without due process of law, an argument that he also raises on appeal. The district court did not rule on that issue, however, and Woods did not request that the district court make a ruling on the issue. Error is thus not preserved on Woods's due process claim, *see State v. Chawech*, 15 N.W.3d 78, 83 (Iowa 2024) (stating that error preservation rules apply in criminal cases and that an issue must be "(1) properly raised in the district court and (2) ruled on by the district court" to preserve error), and we need not address it any further.

constitutionality of his conviction for violating section 724.8B. The district court accepted the guilty plea and sentenced Woods to concurrent sentences of 180 days in jail for the drug offense and 365 days in jail for the dangerous weapon offense, both sentences suspended. Woods timely filed this appeal. The adjudication of this appeal is in the interest of justice, and we have jurisdiction over the appeal. *See* Iowa Code § 814.6(3) (2025) (providing for appellate jurisdiction over conditional guilty pleas when "in the interest of justice"); *State v. McClain*, 20 N.W.3d 488, 494–95 (Iowa 2025) (discussing the jurisdictional statute and the interest of justice standard).

## II.

Woods contends that his conviction for carrying a dangerous weapon in violation of Iowa Code section 724.8B (2023) violates his federal constitutional right to keep and bear arms.[2] The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." The Supreme Court has made the Second Amendment applicable to the states via the incorporation doctrine under the Fourteenth Amendment. *See McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

---

[2]Woods appears to assert both a facial challenge and an as-applied challenge to his conviction under section 724.8B. In a facial challenge to a statute, the party contends that there is "no application of the statute [that] could be constitutional under any set of facts." *Doss v. State*, 961 N.W.2d 701, 716 (Iowa 2021) (quoting *Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 764 (Iowa 2019)). In an as-applied challenge, the party "alleges the statute is unconstitutional as applied to a particular set of facts." *Id.* (quoting *Bonilla*, 930 N.W.2d at 764). A facial challenge "is the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). To successfully prevail against a facial challenge, the "[g]overnment need only demonstrate that [the challenged law] is constitutional in some of its applications." *Id.* We need not dwell on the distinction between these two types of challenges here because section 724.8B "is constitutional as applied to the facts of [Woods's] own case." *Id.*

A.

In *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and in *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court instructed courts to engage in a particular analytical process when evaluating Second Amendment claims. Under the first step of the *Bruen* test, courts must make a threshold determination whether the challenger is part of "the people" included in the Second Amendment and whether the "Second Amendment's plain text covers [the] individual's conduct." *Bruen*, 597 U.S. at 17; *see id.* at 31–32 (stating that it was "undisputed" that the petitioners were "part of 'the people' whom the Second Amendment protects"). If the individual is part of "the people" and his conduct is covered by the plain text of the Second Amendment, "the Constitution presumptively protects that conduct." *Id.* at 17. If the Federal Constitution protects the conduct at issue, the burden then shifts to the government "[t]o justify its regulation." *Id.* To justify the regulation, "the government may not simply posit that the regulation promotes an important interest." *Id.* Instead, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* To determine whether a firearm regulation is consistent with this nation's historical tradition, "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29).

B.

Woods's challenge to section 724.8B fails at the first step of the *Bruen* test. *See* 597 U.S. at 18 (stating that if "the regulated conduct falls beyond the Amendment's original scope, 'then the analysis can stop there; the regulated activity is categorically unprotected' " (quoting *United States v. Greeno*, 679 F.3d

510, 518 (6th Cir. 2012), *abrogated in part on other grounds by Bruen*, 597 U.S. 1)); *Greeno*, 679 F.3d at 518 (stating that "the analysis can stop" once a court determines that the plain text of the Second Amendment does not protect the conduct prohibited by the statute at issue (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011))). The Second Amendment does not cover or protect a right to carry a firearm while also illegally possessing a controlled substance or while committing an indictable offense.

The federal constitutional right to keep and bear arms "is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The federal constitutional right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Instead, it is a limited right of responsible, law-abiding citizens to keep and bear arms when engaged in *lawful* conduct. The Supreme Court has made this crystal clear. *Bruen*, 597 U.S. at 8–9 ("[T]he Second and Fourteenth Amendments protect the right of an ordinary, law-abiding citizen to possess a handgun . . . ."); *id.* at 9–10 ("In this case, petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense. We too agree . . . ."); *id.* at 26 (stating that the Second Amendment " 'elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense" (quoting *Heller*, 554 U.S. at 635)); *id.* at 31–32 ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects."); *id.* at 38 (discussing the lack of historical tradition regarding limitations on public carry for "law-abiding citizens"); *id.* at 60 (discussing the lack of historical limitations on "law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose"); *id.* at 70 (noting that "law-abiding, responsible citizens"

historically have not had to demonstrate a special need to carry arms for self-protection); *id.* at 71 ("New York's proper-cause requirement violates the Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms."); *McDonald,* 561 U.S. at 780 (stating that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes"); *Heller,* 554 U.S. at 625, 635; *see also Snope v. Brown,* 145 S. Ct. 1534, 1534 (2025) (mem.) (Kavanaugh, J., statement respecting the denial of certiorari) (stating that *District of Columbia v. Heller* "further determined that the Second Amendment protects" the use of certain weapons by "law-abiding citizens" and using the term "law-abiding citizens" four times); *id.* at *5 (Thomas, J., dissenting) (dissenting from the denial of certiorari because the question presented was "of critical importance to tens of millions of *law-abiding* AR-15 owners" (emphasis added)).

Federal courts have thus consistently held that "[t]he Constitution does not give anyone the right to be armed while committing a [crime]." *United States v. Jackson,* 555 F.3d 635, 636 (7th Cir. 2009). In *United States v. Risner,* 129 F.4th 361, 364 (6th Cir. 2025), the Sixth Circuit evaluated a post-*Bruen* Second Amendment challenge to a sentencing enhancement for possession of a firearm while committing certain federal crimes. The court focused "on whether the Second Amendment's right 'protected the possession of weapons by individuals engaged in criminal activity.' " *Id.* at 367–68 (quoting *Greeno,* 679 F.3d at 519). The court reasoned that it did not, and it ended its analysis there. *See id.* at 368 ("Because we started and stopped our inquiry at step one of the prior test in [*United States v.* ]*Greeno,* nothing in *Bruen* dictates a different approach here.").

In *Johnson v. United States*, No. 23–CV–61575–RAR, 22–CR–60097–RAR, 2023 WL 6442991, at *6 (S.D. Fla. Oct. 3, 2023), a postconviction-relief proceeding, the court dealt with an issue similar to the one presented here. There, the movant was convicted of a gun crime and sought to vacate the conviction on the ground that "the Second Amendment allow[ed] him to possess a 'legal firearm for self-defense'" even though he was in possession of illegal drugs. *Id.* Like Woods, the movant argued that the mere presence of illegal drugs "[did] not encumber this right because he was not being dangerous or violent." *Id.* The court rejected the factual premise of the movant's argument that the simultaneous possession of drugs and guns was not dangerous, stating that "[g]uns and drugs 'are a dangerous combination'" that inherently increase the potential for violence. *Id.* (alteration in original) (quoting *Orrego Goez v. United States*, 656 F. Supp. 3d 1370, 1377 (S.D. Fla. 2023)). The court then denied the Second Amendment claim, explaining that "there is a history and tradition of keeping guns away from those engaged in criminal conduct." *Id.* (quoting *Orrego Goez*, 656 F. Supp. 3d at 1376). In the court's view, the movant's "legal right to possess a firearm was extinguished the moment [he] chose to carry his firearm" while committing an illegal act. *Id.* (emphasis omitted).

Other federal cases, also decided after *Bruen*, are in accordance with *Risner* and *Johnson. See, e.g., United States v. Page*, No. CR–25–024–RAW, 2025 WL 1489540, at *1 (E.D. Okla. May 23, 2025) (stating that only "*law-abiding citizens* have a right to carry a gun outside the home for self-defense"); *Madrid v. United States*, No. 1:21cv507, 2024 WL 5466859, at *8 (E.D. Tex. Nov. 19, 2024) (rejecting a Second Amendment challenge to a conviction under 18 U.S.C. § 924(c) at "the first step in the [*Bruen*] analysis" because the Second Amendment "does not cover an individual's right to use or

carry a firearm" in a federal drug crime); *United States v. Barenas-Reynoso*, No. 19–cr–00351–8, 2024 WL 3509757, at *3 (N.D. Ill. July 23, 2024) (rejecting a facial challenge to a conviction under 18 U.S.C. § 924(c) at the first step of the *Bruen* analysis); *United States v. Charles*, No. 6:21–CR–00154–01, 2023 WL 6358688, at *3 (W.D. La. Sept. 28, 2023) (rejecting a Second Amendment challenge to a conviction because the Second Amendment right "is tied to firearm possession and use for lawful purposes by law-abiding citizens"); *United States v. Snead*, 647 F. Supp. 3d 475, 479–81 (W.D. Va. 2022) (explaining that *Heller*, *McDonald*, and *Bruen* "make[] clear that the Second Amendment protects the conduct of law-abiding citizens, and provides no constitutional sanctuary" for non-law abiding citizens).

State courts have also concluded that there is no federal constitutional right to carry a firearm while also committing a crime. *People v. Gonzalez*, 291 Cal. Rptr. 3d 127 (Ct. App. 2022), *abrogated in part on other grounds by Bruen*, 597 U.S. 1, is materially indistinguishable from this case. In that case, a police officer found the defendant "asleep in his car with a bag of methamphetamine and a loaded gun at his feet." *Id.* at 128. As relevant here, the defendant was convicted of possession of a controlled substance while armed. *Id.* Like Woods, the defendant contended his conviction "violate[d] the Second Amendment by restricting a nonviolent offender's right to possess firearms." *Id.* The court rejected the challenge. *Id.* It explained that the first step in determining a challenged statute's constitutionality under the Second Amendment is to determine " 'whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee' of protecting the right of responsible, law-abiding citizens to possess firearms." *Id.* at 130 (quoting *Gould v. Morgan*, 907 F.3d 659, 668–69 (1st Cir. 2018), *abrogated in part on other*

*grounds by Bruen*, 597 U.S. 1). It stated that it was "aware of no court decision holding that the United States Constitution protects a right to carry a gun while simultaneously engaging in criminal conduct," *id.* at 130, and held that "[t]here is no constitutional right to carry a gun while committing a crime," *id.* at 132.

Although *People v. Gonzalez* was issued before *Bruen*, its threshold analysis was later affirmed post-*Bruen*. *See People v. Allen*, 314 Cal. Rptr. 3d 474, 476 (Ct. App. 2023) ("We reject the constitutional challenges, and we publish our analysis concerning possession of a controlled substance while armed with a firearm to confirm that [*Gonzalez*] remains good law."); *see also Bruen*, 597 U.S. at 19 (stating that the first step of the predominant Second Amendment framework pre-*Bruen* was "broadly consistent" with the first step of the *Bruen* test). In *People v. Allen*, 314 Cal. Rptr. 3d at 475, the defendant was convicted of "possessing a controlled substance while armed with a firearm." The defendant challenged the conviction on Second Amendment grounds. *Id.* at 476. The court rejected the challenge at the first step of the *Bruen* analysis. *Id.* at 479. The court concluded that the Second Amendment protects " 'law-abiding citizens only' and does not 'protect[] a right to carry a gun while simultaneously engaging in criminal conduct.' " *Id.* (alteration in original) (quoting *Gonzalez*, 291 Cal. Rptr. 3d at 130). Consistent with *Gonzalez*, the court did not even proceed with the second step of the *Bruen* analysis:

> Allen focuses exclusively on the second step of the *Bruen* analysis, arguing that there were "no regulation[s] in or around 1791 that prohibited individuals in possession of any drug from also being armed" and that there are no other relevant, analogous prohibitions. . . . [U]nder *Bruen* we need not analyze whether a regulation is "consistent with the Nation's historical tradition of firearm regulation" if the individual's regulated conduct is not covered by the Second Amendment.

*Id.* at 479–80 (first alteration in original) (quoting *Bruen*, 597 U.S. at 24).

Similarly, in *Fitzgerald v. Commonwealth*, No. 0261–24–3, 2025 WL 1559568, at *1–2 (Va. Ct. App. June 3, 2025), the defendant was convicted of violating a Virginia statute that criminalized the possession of a firearm while possessing a schedule I or II controlled substance after law enforcement found a shotgun and cocaine inside the defendant's bedroom. The defendant brought an as-applied Second Amendment challenge to the statute, which the court rejected. *Id.* at *5. The court noted that, like Iowa Code section 724.8B, the Virginia statute only "proscribes a temporary loss of gun rights when and where a person possesses such a substance while *simultaneously* knowingly and intentionally possessing the firearm in question." *Id.* at *8. The court added that there was an "underlying *dangerousness* stemming from concurrent drug and firearm possession" even if the defendant was merely in constructive possession of those items. *Id.* at *11. The court thus concluded that based on *Heller*, *Rahimi*, and relevant Virginia precedent, "the right to keep and bear arms in the home for self-defense does not include the right to concurrent drug and firearm possession, *even where the arms in question are found in the home* not on the defendant's person." *Id.* at *8.

In *State v. Jones*, 249 N.E.3d 782, 792–94 (Ohio Ct. App. 2024), the court rejected a federal and state constitutional challenge to a law that enhanced the defendant's criminal sentence for possession of a firearm while possessing drugs. The court explained that the Second Amendment right applies to " 'law-abiding,' responsible citizens, not those who would violate the nation's laws." *Id.* at 794 (quoting *State v. Windland*, No. 2023 CA 00068, 2024 WL 2037674, at *6 (Ohio Ct. App. May 6, 2024)). Like Woods, the defendant argued that the Second Amendment should apply because the handgun was not used during the commission of or in the furtherance of any crime. *Id.* The court rejected the

argument, reasoning that the "close proximity" between the firearm and the drugs was sufficient. *Id.* "Consequently, since the Second Amendment to the United States Constitution and Article I, Section 4 of the Ohio Constitution apply 'only to those who are [not] actively violating the nation's drug laws,' [the law was] not unconstitutional as applied to Jones." *Id.* (first alteration in original) (quoting *Windland,* 2024 WL 2037674, at *6). The same rationale applies here.

Indeed, in two cases decided prior to *Bruen* (and *Heller,* actually), this court had already reached the common-sense conclusion that the federal constitutional right to keep and bear arms does not include the right to carry while in the illegal possession of a controlled substance or while committing an indictable offense. In *State v. Mehner,* 480 N.W.2d 872, 878 (Iowa 1992), the defendant challenged the constitutionality of Iowa Code section 204.401(1)(*e*) (Supp. 1989), which enhanced the sentence for certain drug offenses for those "in the immediate possession or control of a firearm" while committing the drug offense. We rejected the Second Amendment challenge with little difficulty: "Although Mehner argues the constitution gives him the right to possess firearms, the statute involved prohibits only the possession of firearms while participating in a drug offense; a criminal activity. The statute does not forbid conduct which is constitutionally protected." *Id.* at 879.

In *State v. Brecunier,* 564 N.W.2d 365, 367 (Iowa 1997), the defendant was charged with interference with official acts while armed, in violation of Iowa Code section 719.1 (1993). He moved to dismiss the charge on the ground that, as relevant here, enforcement of the law violated his rights under the Second Amendment. *Id.* The district court denied the motion to dismiss, and a jury found him guilty as charged. *Id.* This court rejected the Second Amendment challenge on appeal. *Id.* at 370. This court explained that the law was "unsettled as to the

precise scope of what rights the Second Amendment protects" but that the court was "certain . . . in what it does *not* protect." *Id.* This court held that the defendant "ha[d] no constitutional right to be armed" while committing a crime. *Id.* Accordingly, "[h]is Second Amendment constitutional challenge must fail, and the judgment entered upon his conviction must be affirmed." *Id.*

While we acknowledge that *Mehner* and *Brecunier* are not controlling because they pre-date *Heller* and *Bruen* and thus do not feature an adequate historical analysis, *see Risner*, 129 F.4th at 366–67 (noting that the first step of the historical analysis post-*Heller* was "embrace[d]" by the Supreme Court in *Bruen*, but pre-*Heller* cases may have used a different mode of analysis), nothing in *Bruen* undermines their holdings. The holding in each case—that there is no Second Amendment right to carry a firearm while in the illegal possession of a controlled substance or while committing an indictable offense—is widely supported by post-*Heller* and post-*Bruen* caselaw. *See, e.g., id.* at 368 ("[W]e have no reason to depart from *Greeno*'s holding that the historical understanding of the right to keep and bear arms does not extend to the use of a firearm for an unlawful purpose."); *United States v. Cole*, No. 24–10877, 2025 WL 339894, at *4 (11th Cir. Jan. 30, 2025) (per curiam) (affirming a post-*Bruen* and post-*Rahimi* felon-in-possession conviction based on a pre-*Bruen* decision because neither *Bruen* nor *Rahimi* came close to "demolish[ing]" or "evisercat[ing]" the pre-*Bruen* case's "fundamental props" (alterations in original) (quoting *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022))); *Allen*, 314 Cal Rptr. 3d at 479 (concluding that *Gonzalez*, 291 Cal. Rptr. 3d 127, "remain[ed] good law after *Bruen*").

We thus conclude that Woods's conviction for carrying a dangerous weapon while illegally possessing a controlled substance and while committing an indictable offense does not violate the Second and Fourteenth Amendments.

C.

Even if the conduct at issue here—the possession of a firearm while illegally possessing a controlled substance or while committing an indictable offense—was covered by the Second Amendment, Woods's federal challenge to his conviction would nonetheless fail. To justify the regulation, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. The challenged law must be " 'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). "Why and how the regulation burdens the right are central to this inquiry." *Id.* The "why" analysis instructs that "if laws at the Founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category" of firearms regulation. *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024) (quoting *Rahimi*, 602 U.S. at 692). The "how" analysis warns that "a law . . . may not be compatible with the right if it [is regulated] to an extent beyond what was done at the Founding." *Id.* (alteration and omission in original) (quoting *Rahimi*, 602 U.S. at 692).

We start with the "why" behind the challenged law. "The state possesses a strong compelling interest in maintaining public safety and preventing gun violence." *State v. Weber*, 132 N.E.3d 1140, 1148 (Ohio Ct. App. 2019). Carrying a firearm during the commission of an indictable offense increases the risk of danger and violence to the perpetrator, the victim, if any, and those investigating

or responding to the crime, including members of the public, private security officers, and public peace officers. There is no category of crime where the perpetrator's possession of a pistol during the commission of the crime makes the situation safer. The government thus has "a compelling interest in public safety and preventing crime through the uniform enforcement of gun control laws." *United States v. Harper*, 634 F. Supp. 3d 594, 603 (N.D. Iowa 2022).

The government's interest in public safety, generally, and peace officer safety, particularly, extends to drug offenses. "[D]rugs and guns are a dangerous combination." *Smith v. United States*, 508 U.S. 223, 240 (1993). Contrary to Woods's (and the dissent's) assertion, mixing drugs and guns together is inherently dangerous, even in the case of personal use. "Even one who simply possesses a controlled substance . . . must generally obtain it from someone else, and firearms are often involved in drug transactions. This dangerous connection between illegal drugs and firearms is well-known and has been recognized by Congress." *United States v. Levasseur*, No. 1:22–cr–00155–LEW, 2023 WL 6623165, at *9 (D. Me. Oct. 11, 2023). Further,

> [I]t is reasonable to assume a person armed with a loaded, operable firearm during the commission of *any* crime may be willing to resort to use of that weapon to avoid arrest and—in the case of section 11370.1 [drug possession statute], specifically—to maintain possession of their illicit stash. It is also reasonable to assume that some people who have controlled substances . . . also abuse those drugs, making their immediate access to a loaded, operable firearm more of a threat to public safety than someone . . . who isn't in the process of committing a crime. Indeed, the potentially "deadly combination" of illegal drugs and firearms is precisely what the Legislature intended to address by enacting section 11370.1.

*Gonzalez*, 291 Cal. Rptr. 3d at 130–32 (citation omitted) (quoting *People v. Pena*, 88 Cal. Rptr. 2d 656, 659 (Ct. App. 1999)).

Woods suggests that personal-use marijuana offenses may not raise the same concerns, but his claim is incorrect. Contrary to popular belief, and the dissent's assertion, the possession of marijuana is still illegal in every state because marijuana remains a controlled substance under federal law. 21 U.S.C. § 812, sched. I (c)(10). It is just doubly illegal in Iowa. *State v. Middlekauff*, 974 N.W.2d 781, 791 (Iowa 2022) (stating that marijuana is listed as a schedule I controlled substance "[u]nder both Iowa and federal law"). So the same concerns for peace officer safety arising out of the investigation of drug offenses and the apprehension of drug offenders apply equally to marijuana offenses, including personal-use marijuana offenses.

The facts of this case bear out that concern. Woods was pulled over because of an inoperable light on the trailer of his commercial vehicle. During the traffic stop, the officer observed a THC vape pen on the center console of the vehicle and smelled marijuana wafting from the cabin, indicating that Woods may have been using while driving and while in possession of a loaded pistol. The loaded pistol was contained in a backpack on the center console, readily accessible to Woods. Although Woods did not use the loaded pistol to avoid apprehension in this case, that does not make the potential for death or physical injury to the officer and Woods any less real. Traffic stops, especially stops where the motorist is in possession of drugs and guns, are inherently dangerous:

> Even for routine traffic violations, traffic stops are "fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983). An "inordinate risk confront[s] an officer as he approaches a person seated in an automobile." *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977) (*per curiam*). That is in part because officers operate at a "tactical disadvantage" when "approaching an unknown vehicle, with limited visibility and unpredictable threats." Brief for National Fraternal Order of Police as *Amicus Curiae* 4. As this Court noted nearly 50 years ago, "a significant percentage of

murders of police officers occurs when the officers are making traffic stops." *Mimms*, 434 U.S., at 110, 98 S. Ct. 330 (quoting *United States v. Robinson*, 414 U.S. 218, 234, n. 5, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973)). Traffic stops remain highly dangerous today. . . .

> **Officers cannot let their guard down and assume that any particular traffic stop will be safe—even if a driver is pulled over for nothing more than a speeding violation, a broken taillight, or the like. The driver may be drunk, on drugs, armed, or some combination thereof.** Or the driver may have committed (or may be about to commit) a serious crime. "People detained for minor offenses" such as ordinary traffic violations "can turn out to be the most devious and dangerous criminals." *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 334, 132 S. Ct. 1510, 182 L. Ed. 2d 566 (2012). . . .

> **So even though most traffic stops end without incident, traffic stops are nonetheless inherently risky for police officers.**

*Barnes v. Felix*, 145 S. Ct. 1353, 1360–61 (2025) (Kavanaugh, J., with whom Thomas, Alito, and Barrett, JJ., join, concurring) (alteration in original) (emphases added).

Having looked at the "why" underlying the current law, we now turn to "how" the law is implemented. Iowa Code section 724.8B (2023) is a narrow law. Section 724.8B does not involve a licensing scheme, a permanent or lengthy dispossession law, or a limitation on the right to keep and bear arms while engaged in lawful activity. Section 724.8B does not prohibit any individual from owning a firearm, possessing a firearm, or carrying a firearm. Instead, as relevant here, the statute makes it a criminal offense for an individual to carry a firearm only during the limited time in which the individual is also simultaneously in the illegal possession of a controlled substance or while the person is committing an indictable offense.

Woods fails to appreciate the limited nature of the regulation at issue in this case and thus makes a categorical error when looking at historical analogues. Rather than comparing section 724.8B to limited

criminal-conduct-based regulations that prohibit a person from carrying a firearm only at certain times—in particular, when the person is in the illegal possession of a controlled substance or committing an indictable offense—Woods compares section 724.8B to status-based dispossession statutes. But the distinction between limited conduct-based regulations and status-based dispossession statutes matters. A status-based dispossession statute has the potential to infringe on protected Second and Fourteenth Amendment rights because the individual is unable to own or possess a firearm at all, whereas a limited criminal-conduct-based regulation has no such potential:

> [D]ispossession laws prohibit individuals from possessing firearms in the future based on their *past* criminal conduct [or status]. Section 11370.1 [a conduct-based law], in contrast, prohibits individuals from possessing firearms while *simultaneously* committing criminal activity. [A] convicted nonviolent felon, could at least argue that if he were allowed to possess firearms, he would use them for a lawful purpose (e.g., defense of the home or certain military purposes). [The defendant] cannot make that argument. Instead he seeks to validate his possession of a gun for an unlawful purpose, something on which Second Amendment jurisprudence, for all its murkiness, is quite clear. There is no constitutional right to carry a gun while committing a crime.

*Gonzalez*, 291 Cal. Rptr. 3d at 130–32.

Indeed, the primary case on which Woods relies, *United States v. Daniels*, 124 F.4th 967, 970 (5th Cir. 2025), undercuts his argument because it makes the distinction between historical conduct-based laws that regulated when a person could *carry* a firearm and historical status-based laws that prohibited a person from even *possessing* a firearm. In that case, the defendant was convicted of violating 18 U.S.C. § 922(g)(3), which wholly bars a person who is an "unlawful user of or addicted to any controlled substance" of shipping, transporting, possessing, or receiving a firearm. *Id.* The Fifth Circuit, relying on its controlling decision *United States v. Connelly*, 117 F.4th 269, reversed and remanded the

conviction. *Daniels*, 124 F.4th at 978–79. Part of the court's rationale was that historically, there were laws that "banned *carrying* weapons while under the influence" under certain conditions but "none [that] barred gun *possession* by regular drinkers." *Id.* at 974 (quoting *Connelly*, 117 F.4th at 280). That distinction—between limits on the right to carry a firearm based on conduct and prohibitions on the right to possess a firearm based on status—meant the dispossession statute at issue did "not impose a comparable burden on the right holder" and thus had no historical analogue. *Id.* Further, there was only a vague "temporal nexus" between the disqualifying conduct and the limitation of the right. *See id.* (quoting *Connelly*, 117 F.4th at 282).

Unlike the dispossession law at issue in *Daniels* and *Connelly*, carry laws like section 724.8B that criminalize or further penalize the carrying of a firearm while *simultaneously* in the illegal possession of a controlled substance or while *simultaneously* committing an indictable offense are "analogous enough [to historical precursors] to pass constitutional muster" at the justification stage of the *Bruen* analysis. *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30). "Crimes historically have been subject to enhanced sentences because they were committed with firearms—true both just before and contemporaneous to the Second Amendment's ratification in 1791." *United States v. Wigfall*, 677 F. Supp. 3d 791, 796 (N.D. Ind. 2023).

> In 1788, the Northwest Territory—a federal jurisdiction with laws enacted by a governor and three judges, all subject then to congressional approval, *see* An Ordinance for the Government of the Territory of the United States North West of the River Ohio (July 13, 1787), *reprinted in Documents Illustrative of the Union of the American States, House Doc. No. 398, 69th Cong., 1st Sess.* (1927) (Northwest Ordinance)—punished breaking and entering more severely when a person was "armed with any dangerous weapon or weapons" by causing offenders to forfeit their estate and to face 40 years in gaol (jail), *see Laws Passed in the Territory of the United*

*States, North-West of the River Ohio, from the Commencement of the Government to the 31st of December, 1791*, 20 (1792). Federal legislation establishing the Mississippi Territory (later Alabama and Mississippi) based its governance on the Northwest Territory's model, and its earliest laws in 1799 and 1800—later known as the Sargent's Code based on the Federalist Governor Winthrop Sargent—increased punishment for both burglary and robbery when the culprit was armed with a dangerous weapon. *See* A Law Respecting Crimes and Punishments (Feb. 28, 1799), *reprinted in Sargent's Code: A Collection of the Original Laws of the Mississippi Territory Enacted 1799–1800: By Governor Winthrop Sargent and the Territorial Judges* 12–13 (1939) (*e.g.*, enhancing sentence for burglary with a dangerous weapon from three to four years); *see also* Michael H. Hoffheimer, *Murder and Manslaughter in Mississippi: Unintentional Killings*, 71 Miss. L. J. 35, 55 n. 47–48 (2001).

*Id.* at 797 (footnote omitted). Similar laws were in place at the time the Fourteenth Amendment was ratified in 1868. *See id.* at 798–99 (discussing laws in the 1800s). Take Iowa, for example. The Revision of 1860 of the Code of Iowa punished robbery and burglary more severely if the offender was "armed with a dangerous weapon." Iowa Code § 4202 (1860); *id.* § 4233. These more severe sanctions were also included in the 1873 Code of Iowa. Iowa Code § 3859 (1873); *id.* § 3892.

In the interest of brevity, we need not recite all the relevant historical analogues that demonstrate Iowa Code section 724.8B (2023), as applied here, is consistent with "this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. Other courts have done so, and they have definitively established that the type of limited conduct-based regulation at issue in this case is relevantly similar to this nation's history of firearms regulations. *See Rahimi*, 602 U.S. at 699 (holding that the challenged law was consistent with historical analogues because, among other aspects, the "restriction was temporary"); *United States v. Underwood*, 129 F.4th 912, 930 (6th Cir. 2025) ("In the period surrounding the founding, many states . . . began to provide for enhanced

punishment for crimes committed while the perpetrator was armed with a deadly weapon."); *Greeno*, 679 F.3d at 519–20 (reviewing the historical analogues and concluding that there is no right to possess a firearm while engaged in criminal activity); *Wigfall*, 677 F. Supp. 3d at 796–800 (reviewing the relevantly similar laws at the time of the founding and at the time of the adoption of the Fourteenth Amendment and rejecting the defendant's challenge); *Commonwealth v. Jenkins*, 328 A.3d 1076, 1089–91, 1093–94 (Pa. Super. Ct. 2024) (conducting a thorough survey of the historical materials and concluding that conduct-based firearm prohibitions are historically justified); *Fitzgerald*, 2025 WL 1559568, at *12 ("[T]here is a sufficient historical analogue for Code § 18.2-308.4 [prohibiting firearms possession while in the possession of controlled substances] in the historical prohibition against possessing firearms while smuggling contraband."); *Watkins v. Commonwealth*, 911 S.E.2d 181, 184 (Va. Ct. App. 2025) (rejecting a defendant's Second Amendment challenge to his conviction for "possessing a firearm while also possessing a controlled substance" and concluding that the law was "constitutional as applied to [the defendant] under the test set out in *Bruen* and *Rahimi*"); *Commonwealth v. Webb*, No. 1805–24–3, 2025 WL 898249, at *5 (Va. Ct. App. Mar. 25, 2025) ("We find that the regulation here is passed for a similar purpose to the historical analogues set out in *Watkins*, and it imposes a similar burden.").

In *United States v. Alaniz*, 69 F.4th 1124, 1128–29 (9th Cir. 2023), the court rejected a challenge to a federal sentencing enhancement triggered by the possession of a firearm. The court reasoned that there was a "well-established" "historical tradition" of criminalizing the possession of a firearm while committing a crime or increasing "the severity of punishment for certain felonies when weapons were possessed, but not necessarily used, during the commission

of the crime." *Id.* at 1129. The court rejected the defendant's contrary arguments as "divorced from both reality and the law." *Id.* "The analogues show a longstanding tradition of enhancing a defendant's sentence for the increased risk of violence created by mere possession of a firearm during the commission of certain crimes." *Id.* at 1130.

In *Commonwealth v. Webb,* 2025 WL 898249, at *1, the court rejected a defendant's Second Amendment challenge to a Virginia statute criminalizing the possession of a firearm while in the possession of a controlled substance. Like Woods, the defendant argued that the criminal statute was unconstitutional as applied to him following *Bruen* and *Rahimi* because "disarming an individual based solely on the possession of a controlled substance lacked a historical precedent." *Id.* Like Woods, the defendant argued that a showing of dangerousness was required and there was no showing of dangerousness. *See id.* at *4. The court disagreed. *Id.* at *4–5. "[A] person possessing both a controlled substance and a firearm together is dangerous" and "the United States has a historical tradition of disarming the dangerous." *Id.* at *4. Further, like section 724.8B, the challenged law only "place[d] a temporary restriction on the possession of a firearm, and it [was] limited to when an individual [was] possessing a controlled substance." *Id.* at *5. The court reasoned that an "individual can reclaim or retain his or her right to possess a firearm by not possessing the controlled substance." *Id.*

We agree with these conclusions, and we note that the Virginia Court of Appeals expanded this analysis recently in *Fitzgerald.* There, the court stated that "there is no historic evidence suggesting that persons had a right to possess firearms *during an offense*" and that founding-era English smuggling laws served

as a historical analogue justifying the prohibition of concurrent possession of a firearm and contraband:

> [T]he actus reus of both [laws] required the intentional and knowing possession of a firearm and the possession of contraband, which in the case of Code § 18.2-308.4 is a Schedule I/II controlled substance. *See* Blackstone, *supra*, \*155. Both statutes regulated "firearm use to address particular problems," with this problem being the possession of the firearm to protect the contraband from discovery. *Connelly*, 117 F.4th at 274. And Code § 18.2-308.4 regulates firearms to a much more limited extent than this smuggling felony as Blackstone noted that courts "cannot surely be too cautious in inflicting the penalty of death" for that felony due to its effect on the English economy by facilitating illicit trade. *See* Blackstone, *supra*, \*155. Under Code § 18.2-308.4, the offender is only disarmed where he possesses both the substance and the weapon, which are both indicative of involving in the illicit drug trade of which the smuggling offense is but an older and broader relative. It may not be a "dead ringer," but it is clearly a "historical analogue" for purposes of the *Bruen* analysis. *Rahimi*, 602 U.S. at 708–09 (Gorsuch, J., concurring) (quoting *Bruen*, 597 U.S. at 30).

*Fitzgerald*, 2025 WL 1559568, at \*13 (footnote omitted). We agree with this analysis.

D.

Woods is asking this court to do what no other court in the country has done and hold that there is a federal constitutional right to carry a firearm while simultaneously in the illegal possession of a controlled substance or while simultaneously engaged in indictable criminal activity. *See Wigfall*, 677 F. Supp. 3d at 800 (rejecting the defendant's challenge to a federal sentencing enhancement and stating, "Mr. Wigfall cites no cases that have ruled his way, and tellingly the court finds none"); *Gonzalez*, 291 Cal. Rptr. 3d at 130 (rejecting the defendant's challenge to his conviction for possession of a controlled substance while armed and stating that the court was "aware of no court decision holding that the United States Constitution protects a right to

carry a gun while simultaneously engaging in criminal conduct"). While Iowa is sometimes "first in the nation," we decline to be first in the nation here. The Second Amendment does not cover the conduct at issue in this case, and even if it did, a statute making it a criminal offense to carry a firearm while also in the illegal possession of a controlled substance or while committing an indictable offense is consistent with this "Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

III.

Woods also contends that his conviction for carrying a firearm while in the illegal possession of a controlled substance and while committing an indictable offense violates article I, section 1A of the Iowa Constitution. For the reasons expressed below, we disagree.

In 2022, Iowa voters ratified an amendment to the Iowa Constitution. *In re N.S.,* 13 N.W.3d 811, 826 (Iowa 2024). The amendment, codified as article I, section 1A, recognizes a fundamental right to keep and bear arms:

> The right of the people to keep and bear arms shall not be infringed. The sovereign state of Iowa affirms and recognizes this right to be a fundamental individual right. Any and all restrictions of this right shall be subject to strict scrutiny.

Iowa Const. art. I, § 1A. "By its terms, Amendment 1A recognizes a *fundamental* individual right to keep and bear arms—not an *absolute* right." *N.S.*, 13 N.W.3d at 826. The right is thus subject to regulation.

In assessing a constitutional challenge to a statute or regulation under article I, section 1A, we must first address the threshold question of whether the constitutional provision is even implicated. *See* Todd E. Pettys, *The N.R.A.'s Strict-Scrutiny Amendments*, 104 Iowa L. Rev. 1455, 1481 (2019) (stating that courts should "consider, as a threshold matter, whether the facts in a given

claimant's case bring the fundamental right to keep and bear arms into play"). Under the plain language of the text, article I, section 1A is implicated only where the challenged law "infringe[s]" or "restrict[s]" "[t]he right of the people to keep and bear arms." Iowa Const. art. I, § 1A. In determining whether a law infringes or restricts the state constitutional right to keep and bear arms, we tread carefully. We presume that the general assembly, in twice approving the amendment before submitting it to the people for a referendum, did not intend the amendment to overturn the numerous laws on the books imposing more serious sanctions for crimes committed with the use of firearms and other dangerous weapons. *Cf. N.S.*, 13 N.W.3d at 826 (detailing the process of enacting amendment 1A). Further, while the legal standard of strict scrutiny is well-established, "there is no settled analysis as to how strict scrutiny applies to laws affecting the fundamental right to bear arms, which has historically been interpreted to have accepted limitations." *Dotson v. Kander*, 464 S.W.3d 190, 197 (Mo. 2015) (en banc) (per curiam).

With those considerations in mind, we conclude that Woods's state constitutional challenge fails at this threshold step. Like the federal constitutional right to keep and bear arms, the state constitutional right does not include the right to carry a firearm while in the illegal possession of a controlled substance or while committing an indictable offense. *See Brecunier*, 564 N.W.2d at 370 (holding that there is "no constitutional right to be armed" while committing a crime); *Mehner*, 480 N.W.2d at 879 ("Although Mehner argues the constitution gives him the right to possess firearms, the statute involved prohibits only the possession of firearms while participating in a drug offense; a criminal activity. The statute does not forbid conduct which is constitutionally protected."); *see also Risner*, 129 F.4th at 368 (reaffirming *Greeno*'s holding that

a sentencing enhancement that "applied to individuals who possessed a firearm" while committing a federal drug offense "regulated conduct [that] was not within the Second Amendment's scope"); *United States v. Jenkins*, 697 F. Supp. 3d 380, 394 (E.D. Pa. 2023) ("Neither *Heller* nor *McDonald* expressly extended the right to bear arms beyond lawful activities."); *Johnson*, 2023 WL 6442991, at *6 ("[T]here is a history and tradition of keeping guns away from those engaged in criminal conduct . . . ." (quoting *Orrego Goez*, 656 F. Supp. 3d at 1376)); *Charles*, 2023 WL 6358688, at *3 ("[T]he Supreme Court has repeatedly emphasized that the Second Amendment right is tied to firearm possession . . . by law-abiding citizens."); *Snead*, 647 F. Supp. 3d at 481 (stating that *Bruen*, *Heller*, and *McDonald* make "clear that the Second Amendment protects the conduct of law-abiding citizens"); *Allen*, 314 Cal. Rptr. 3d at 479 ("[T]he Second Amendment . . . does not 'protect[] a right to carry a gun while simultaneously engaging in criminal conduct.' " (second alteration in original) (quoting *Gonzalez*, 291 Cal. Rptr. 3d at 130)); *Gonzalez*, 291 Cal. Rptr. 3d at 130 ("While the Supreme Court has not yet delineated the precise scope of the Second Amendment, it has made abundantly clear that its protections inure to the benefit of law-abiding citizens only."); *Jones*, 249 N.E.3d at 794 ("[T]he Second Amendment . . . appl[ies] 'only to those who are [not] actively violating the nation's drug laws . . . .' " (third alteration in original) (quoting *Windland*, 2024 WL 2037674, at *6)).

Even if there were such a right, and even if section 724.8B could be considered an infringement or restriction of such a right, the statute, as applied here, still survives strict scrutiny review. "Under strict scrutiny, 'the statute will survive a constitutional challenge only if it is shown that the statute is narrowly drawn to serve a compelling state interest.' " *AFSCME Iowa Council 61 v. State*,

928 N.W.2d 21, 41 (Iowa 2019) (quoting *City of Maquoketa v. Russell*, 484 N.W.2d 179, 184 (Iowa 1992) (en banc)). "The first step in [the] strict-scrutiny analysis is to identify the 'compelling' government interest served by the challenged law." *N.S.*, 13 N.W.3d at 830. If the government identifies a compelling interest, it must show that the challenged law is "narrowly tailored to serve that interest." *Id.* at 831. "Narrow tailoring does not require exhaustion of every conceivable . . . alternative." *Id.* (omission in original) (quoting *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003)).

As discussed above, the state has a compelling interest in public safety, including preventing death and physical injury caused by firearms. *See State v. Kellogg*, 534 N.W.2d 431, 434 (Iowa 1995) (stating that the government has a "compelling interest in the public safety"); *see also Harper*, 634 F. Supp. 3d at 603; *Weber*, 132 N.E.3d at 1148 ("The state possesses a strong compelling interest in maintaining public safety and preventing gun violence."). In particular, the state has a compelling interest in curbing the increased risk of death and physical injury associated with an individual's possession of a firearm while simultaneously in the illegal possession of a controlled substance or while simultaneously committing an indictable offense. The government also has a compelling interest in protecting the safety of peace officers, *see Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977) (per curiam), who are placed at increased risk of death and physical injury when investigating and responding to crimes committed when the suspect is in possession of a firearm. Woods concedes that these are compelling state interests.

Section 724.8B is narrowly tailored to achieve these interests. As relevant here, section 724.8B only limits an individual from carrying a firearm when the individual is also in illegal possession of a controlled substance or while

committing an indictable offense. Iowa Code § 724.8B. Unlike the law at issue in *Daniels* and *Connelly,* upon which Woods and the dissent rely, there is a precise temporal and spatial nexus between the statutory regulation of the right to carry a firearm and the conduct that justifies the limitation of that right. Further, the statute excludes from its operation low-level offenses and instead applies only when the person is carrying a firearm while committing a crime of sufficient gravity—an indictable offense. *Id.* In effect, under section 724.8B, Woods "himself controls his right to [carry] a gun." *United States v. Yancey,* 621 F.3d 681, 687 (7th Cir. 2010) (per curiam). He can carry a gun when he so chooses, but the state constitution affords him no additional constitutional right to also simultaneously illegally possess a controlled substance or commit an indictable offense while doing so.

The Louisiana Supreme Court reached the same conclusion in a materially indistinguishable case. Louisiana, like Iowa, is one of the few states that has a strict scrutiny provision in its state constitution protecting the right to keep and bear arms. *See* La. Const. art. I, § 11. In *State v. Webb,* 144 So. 3d 971, 974 (La. 2014), the defendant was found with a personal-use amount of marijuana in his backpack and a legally purchased firearm on the floorboard of the car his girlfriend was driving. He was only charged with "carrying a firearm while in possession of illegal drugs." *Id.* The Louisiana Supreme Court held that the conviction survived the strict scrutiny challenge because "it is constitutionally permissible for the state to treat the entirety of possessing illegal drugs and a firearm as a more serious crime than possessing illegal drugs alone." *Id.* at 982. That is because "on its face, the challenged statute does not restrict the legitimate exercise of the fundamental right to bear arms." *Id.* at 974. "Instead, the statute enhances the penalty for possessing illegal drugs while [] carrying a firearm." *Id.* The court rejected the defendant's argument that the conviction was unconstitutional because he was not dangerous:

According to the defendant, the simultaneous possession of an illegal drug and a firearm is an innocuous coincidence. The defendant also argues that in no way does possessing a firearm by an alleged consumer of illegal drugs, such as himself, promote drug trafficking. Apparently, the defendant would have this court overlook the obvious fact that because possessing marijuana is unlawful, the defendant must have employed some unlawful means to obtain the drug. The defendant would also have this court hold that the firearm must actually be used in some manner in order for La. R.S. 14:95(E) to promote a compelling governmental interest. These arguments are unavailing . . . .

*Id.* at 979. We agree with the reasoning, and we conclude that the application of section 724.8B in this case does not violate article I, section 1A of the Iowa Constitution. *See id.* at 982 ("Because the element of firearm possession in La. R.S. 14:95(E) is more in the nature of an 'enhancement' than a restriction upon the legitimate possession of firearms and the act of possessing illegal drugs 'qualif[ies]' a person's ability to enjoy a fundamental right, we hold the statute 'is precisely drawn or narrowly tailored to serve' the compelling interest of protecting the public from the dangers inherent in the combination of illegal drugs and firearms." (alteration in original) (footnote omitted)).

IV.

We end where we began: there is no federal or state constitutional right to carry a pistol in the same backpack with one's illegal drugs. We affirm the defendant's conviction for violating Iowa Code section 724.8B.

**Affirmed.**

McDonald, J., delivered the opinion of the court, in which Christensen, C.J., and Mansfield, J., joined. Oxley, J., filed an opinion concurring in the judgment. McDermott, J., filed a dissenting opinion, in which Waterman and May, JJ., joined. May, J., filed a dissenting opinion, in which Waterman and McDermott, JJ., joined.

**Oxley, Justice (concurring in the judgment).**

The plurality takes the unnecessary—and unsupported—route of broadly declaring that carrying a firearm while engaging in any indictable offense is conduct that is never protected by the Second Amendment or article I, section 1A.

First, the plurality's overly broad analysis is unnecessary. This case involves an as-applied challenge to a conviction for violating Iowa Code section 724.8B (2023), which prohibits carrying a firearm in three different circumstances: if the person (1) is "ineligible to receive a permit to carry weapons under section 724.8, subsection 2, 3, 4, 5, or 6"; (2) "illegally possesses a controlled substance included in chapter 124, subchapter II"; or (3) "is committing an indictable offense." As the plurality notes, Woods was convicted of violating section 724.8B because he was carrying a firearm while in possession of marijuana. Under Iowa law, marijuana is a controlled substance, and possession of marijuana is a serious misdemeanor (i.e., an indictable offense). So his conduct fits both the second and third prohibitions.

Because we can decide this case based on Woods's illegal possession of a controlled substance (which more closely corresponds to the cases relied upon by the plurality), we need not—and should not—address whether the act of carrying a firearm while committing any other indictable offense is separately protected by the Second Amendment. *See Kluender v. Plum Grove Invs., Inc.*, 985 N.W.2d 466, 470 (Iowa 2023) (recognizing that there is a "fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is

to be applied'" (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008))). Heeding the Fifth Circuit's caution expressed in *United States v. Daniels*:

> [I] sympathize with the desire to articulate a bright-line rule that district courts could apply going forward. But, with due respect, the [all indictable offenses] rule advanced by the [plurality] relies on . . . an understandable but unwarranted aversion to letting Second Amendment doctrine develop more fully as more cases involving different fact patterns arise. A piecemeal approach to laws such as [section 724.8B], determining the contours of acceptable prosecutions through the resolution of continual as-applied challenges, is what *Bruen* and *Rahimi* require. We [should] decline to short-circuit that process now.

124 F.4th 967, 978 (5th Cir. 2025) (footnote omitted). Whether carrying a firearm while committing other indictable offenses in violation of section 724.8B is protected by the Second Amendment is better left for further development in future cases.

Second, the plurality's overbroad analysis is unsupported. Its reasoning greatly extends, rather than merely follows, the cases it relies upon, blurring critical distinctions. The consensus identified by the plurality is not as broad-reaching as the plurality declares. At most, there is a consensus among courts that the Second Amendment provides no protection when a firearm is possessed *for* an unlawful purpose. That limiting principle is important to avoid obliterating the "fundamental" right to "keep and bear arms" contained in the Second Amendment and article I, section 1A. *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010) (identifying "the right to keep and bear arms" in the Second Amendment as a "fundamental right[]"); *see also* Iowa Const. art. I, § 1A ("The sovereign state of Iowa affirms and recognizes this right [to keep and bear arms] to be a fundamental individual right."). I am unaware of any federal or state case that holds, as the plurality would, that an individual has no

constitutional right to possess or carry a firearm while that person is committing any indictable offense, no matter the underlying offense or the connection (or lack thereof) between the firearm and the offense. And the plurality cites none. Instead, it extrapolates well beyond the cases on which it relies to effectively announce a categorical rule.

Nonetheless, I agree with the plurality that there is no constitutional right to carry (or possess or use) a firearm *for* an unlawful purpose. With that qualification, I concur in the judgment.

## I.

"[I]ndividual self-defense is 'the *central component*' of the Second Amendment right" to keep and bear arms, *McDonald*, 561 U.S. at 767 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)), and is "among those fundamental rights necessary to our system of ordered liberty," *id.* at 778. In *New York State Rifle & Pistol Ass'n v. Bruen*, the Supreme Court made clear that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 597 U.S. 1, 10 (2022). The Supreme Court confirmed what it had said in *District of Columbia v. Heller*: "When the Second Amendment's plain text *covers an individual's conduct*, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17 (emphasis added) (discussing its holding in *Heller*). The plurality focuses on this conduct language to conclude that "there is no federal constitutional right to carry a firearm while also committing a crime." While claiming widespread support for this conclusion, the plurality overstates the cases upon which it relies. None of the cases cited by the plurality involve the misdemeanor possession of a controlled substance while carrying a firearm.

The plurality relies primarily on the Supreme Court's description of the Second Amendment right to keep and bear arms as applying to "law-abiding citizens" to conclude that the Second Amendment does not apply to Woods's conduct of carrying a firearm while engaging in an indictable offense. But the scope of the Second Amendment right must come from the amendment's text and history, not the Supreme Court's description of it. "At step one [of the *Bruen* analysis], the [challenger] is tasked with establishing that the Second Amendment's explicit text, '*as informed by history*,' encompasses the conduct they seek to engage in." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024) (emphasis added) (quoting *Bruen*, 597 U.S. at 17, 19); *see also United States v. Rahimi*, 602 U.S. 680, 737 (2024) (Barrett, J., concurring) (explaining that the Second Amendment "codified a pre-existing right, and pre-existing limits on that right are part and parcel of it"). To identify those pre-existing limits—including whether the right extends to the specific conduct of contemporaneously engaging in criminal activity—we "must examine [the] 'historical tradition of firearm regulation.'" *Rahimi*, 602 U.S. at 737 (quoting *Bruen*, 597 U.S. at 17, 19). Likewise, under article I, section 1A of the Iowa Constitution, we should "consider, *as a threshold matter*, whether the facts in a given claimant's case [even] bring the fundamental right to keep and bear arms into play." Todd E. Pettys, *The N.R.A.'s Strict-Scrutiny Amendments*, 104 Iowa L. Rev. 1455, 1481 (2019) (emphasis added).

I agree with the plurality that "the 'historical understanding' of the Second Amendment right 'did not extend to possession of weapons *for* unlawful purposes.'" *United States v. Risner*, 129 F.4th 361, 367 (6th Cir. 2025) (emphasis added) (quoting *United States v. Greeno*, 679 F.3d 510, 520 (6th Cir. 2012), *abrogated in part on other grounds by Bruen*, 597 U.S. 1). But this historical

understanding follows from "going armed" restrictions, not from the Supreme Court's generalized description of the Second Amendment as applying only to "law-abiding" citizens. *See, e.g.*, *Bruen*, 597 U.S. at 43–46, 50 (discussing that the common law, as developed from English law leading to the founding and early colonial law, prohibited "going armed" only when doing so "to terrify the people"). Thus, "during the colonial and founding periods, the common-law offenses of 'affray' or going armed 'to the terror of the people' continued to impose some limits on firearm carry in the antebellum period." *Id.* at 50. As the Fifth Circuit recently explained in rejecting an as-applied challenge to 18 U.S.C. § 922(q)(2)(A)'s prohibition on possessing a firearm within 1,000 feet of a school, "[B]y the time of American independence[,] . . . the old Statute of Northampton . . . was only applicable to carrying for the purpose of terrorizing other people, and not to carrying for legitimate self-defense." *United States v. Allam*, 140 F.4th 289, 297, (5th Cir. June 2025) (alterations and omissions in original) (quoting David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 203, 227 (2018)) (rejecting defendant's as-applied challenge to § 922(q)(2)(A)).

This is a critical qualifier: carrying a firearm is beyond the protection of the Second Amendment when it is done *for* an unlawful purpose. *See Bruen*, 597 U.S. at 56 ("As William Rawle explained in an influential treatise, an individual's carrying of arms was 'sufficient cause to require him to give surety of the peace' *only when* 'attended with circumstances giving just reason to fear that *he purposes to make an unlawful use of them.*' " (emphasis added) (quoting William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829) [hereinafter Rawle])); *see also Snope v. Brown*, 145 S. Ct. 1534, 1534 (2025) (mem.) (Kavanaugh, J., statement respecting the denial of certiorari)

(contrasting law-abiding citizens' use of AR-15s and handguns for lawful purposes with "criminals [who] use both AR-15s and handguns . . . *in unlawful ways* that threaten public safety" (emphasis added)); *United States v. Bryant*, 711 F.3d 364, 369–70 (2d Cir. 2013) (per curiam) ("[W]e hold that the Second Amendment does not protect the *unlawful purpose* of possessing a firearm in furtherance of a drug trafficking crime and that 18 U.S.C. § 924(c) as applied in this case does not violate the Second Amendment."); *United States v. King*, 333 F. App'x 92, 96 (7th Cir. 2009) (unpublished) ("[B]ecause 'there is no constitutional problem with separating guns from drugs,' the district court's enhancement of Underwood's Guidelines range for possession of a dangerous weapon was not erroneous *as long as there was some link between the conspiracy and the weapon.*" (emphasis added) (quoting *United States v. Jackson*, 555 F.3d 635, 636 (7th Cir. 2009))).

The vast majority of cases cited by the plurality fall into this category: where the firearm is possessed *for* an unlawful purpose, most often to facilitate drug trafficking. *See, e.g., Risner*, 129 F.4th at 369 ("Because § 924(c)(1)(A) expressly prohibits the use of a firearm during the commission of a drug trafficking crime—*an objectively unlawful purpose*—and Risner admits to possessing a firearm in connection with drug trafficking, § 924(c)(1)(A) lawfully applies to Risner." (emphasis added)); *Madrid v. United States*, No. 1:21cv507, 2024 WL 5466859, at *1, *8. (E.D. Tex. Nov. 19, 2024) (rejecting Second Amendment challenge where defendant was convicted of discharging a firearm, during and in relation to, a drug trafficking crime); *United States v. Barenas-Reynoso*, No. 19–cr–00351–8, 2024 WL 3509757, at *1 (N.D. Ill. July 23, 2024) (rejecting Second Amendment challenge where defendant was convicted of possessing a firearm in furtherance of a drug-trafficking crime); *United States v.*

*Jenkins*, 697 F. Supp. 3d 380, 383, 400–01 (E.D. Pa. 2023) (rejecting Second Amendment challenge to conviction for being a felon in possession of a firearm where the defendant was arrested on an outstanding burglary warrant and found with a firearm and over a dozen containers of suspected methamphetamine in his possession); *Johnson v. United States*, No. 23–CV–61575–RAR, 22–CR–60097–RAR, 2023 WL 6442991, at *6 (S.D. Fla. Oct. 3, 2023) ("As this Court recently explained, 'there is a history and tradition of keeping guns away from those engaged in criminal conduct[,]' so 'the Second Amendment doesn't protect a person's right to possess a firearm *in furtherance of a felony* offense (like drug trafficking).' . . . [Thus,] even if Movant had a valid concealed carry permit, his *legal right* to possess a firearm was extinguished the moment Movant chose to carry his firearm *to facilitate an illegal act.*" (second emphasis added) (quoting *Orrego Goez v. United States*, 656 F. Supp. 3d 1370, 1376 (S.D. Fla. 2023))); *United States v. Charles*, No. 6:21–CR–00154–01, 2023 WL 6358688, at *1, *3 (W.D. La. Sept. 28, 2023) (rejecting Second Amendment challenge where defendant was convicted of possession of a firearm in furtherance of a drug trafficking crime); *United States v. Snead*, 647 F. Supp. 3d 475, 476–77 (W.D. Va. 2022) (rejecting Second Amendment challenge where defendant was convicted of knowingly possessing a firearm in furtherance of a drug trafficking crime). The plurality blurs this critical portion of these cases through the strategic use of ellipses and paraphrasing.

The plurality also relies on cases holding that the Second Amendment does not protect possession of a firearm while committing a felony without addressing, or even acknowledging, the significant differences between felonies and lesser indictable offenses. *See, e.g.*, *Commonwealth v. Webb*, No. 1805–24–3, 2025 WL 898249, at *4–5, *4 n.6 (Va. Ct. App. Mar. 25, 2025) (recognizing that

"the United States has a historical tradition of disarming the dangerous" and explaining that the dangerousness finding stemmed from the facts that "possession of a controlled substance, regardless of purpose, *is a felony*" and that "[w]hile the Second Amendment protects the right to self-defense, it 'does not give anyone the right to be armed while committing a felony.' " (emphasis added) (quoting *Jackson*, 555 F.3d at 636)). Courts have long recognized a critical distinction between misdemeanors and felonies. *See, e.g., Blackledge v. Perry*, 417 U.S. 21, 28 n.6 (1974) (observing that "conviction of a 'felony' often entails more serious collateral consequences than those incurred through a misdemeanor conviction"); *Baldwin v. New York*, 399 U.S. 66, 69 (1970) ("As in most States, . . . in New York . . . [,] the collateral consequences attaching to a felony conviction are more severe than those attaching to a conviction for a misdemeanor."); *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) ("Whether a certain crime removes one from the category of 'law-abiding and responsible,' in some cases, may be a close question. For example, . . . a misdemeanor arising from a fistfight—may be open to debate. Those who commit felonies however, cannot profit from our recognition of such borderline cases."); *People v. Vigil*, 328 P.3d 1066, 1070–71 (Colo. App. 2013) (noting that "there are significant differences between felonies and misdemeanors beyond the mere length of the term of incarceration faced by the defendant," including "the place of incarceration, the procedural protections enjoyed by the defendant . . . , and collateral consequences faced by a defendant who has been convicted of a felony").

Properly considered, the cases relied upon by the plurality stand for the more limited principle that the constitutional right to carry a firearm in public does not extend to using (or carrying) a firearm for an unlawful purpose. Those

cases focus on the nexus between possessing or carrying the firearm and the unlawful activity. One federal district court relied on by the plurality explained it this way: "This has nothing to do with the person's status for constitutional analysis *but the means by which he perpetrated the crime.*" *United States v. Wigfall*, 677 F. Supp. 3d 791, 796 (N.D. Ind. 2023) (emphasis added) (rejecting a Second Amendment challenge to a sentencing enhancement for possessing a firearm during a drug trafficking offense). That court made clear that the challenged enhancement applies only if the firearm helped perpetrate or facilitate the crime. *Id.*; *see also State v. Jones*, 249 N.E.3d 782, 794 (Ohio Ct. App. 2024) ("Jones was not merely using the firearm for self-defense. Rather, the record reflects that Jones was using the firearm to facilitate drug offenses."). The narrower question these cases permit us to ask is whether Woods was engaged in the conduct of carrying a firearm *for* an illegal purpose.

## II.

The plurality's unnecessary categorical approach could lead to improper results. The plurality broadly concludes that the Second Amendment applies only to lawful conduct and that the United States has a history of disarming persons while violating the law. But which laws?

Iowa Code section 724.8B prohibits carrying a firearm while committing any indictable offense. But carrying a firearm does not necessarily facilitate all indictable offenses. Take, for example, driving while barred. Our court of appeals recently addressed an appeal from a defendant who was convicted of driving while barred, possession of marijuana, and being a person ineligible to carry dangerous weapons under Iowa Code section 724.8B. *See State v. Richter*, No. 22–1298, 2024 WL 960963, at *1 (Iowa Ct. App Mar. 6, 2024). Neighbors called the police after observing a car back out of a driveway across the street,

hitting the neighboring house's downspout. *Id.* While an officer was investigating, the driver returned. *Id.* In a cordial exchange, the officer ran the driver's license and learned his license was barred. *Id.* He told the driver that he would need to arrest him, and the driver told the officer that he had a lawfully permitted gun on his person. *Id.* The officer took the gun and attempted to leave it with someone else inside the house to avoid needing to take it to the station, but no one answered the door. *Id.* at *1–2. The marijuana and section 724.8B charges came about when the officer then got into the defendant's car to move it since it was straddling the sidewalk in the driveway. *Id.* at *2. When he parked on the street, the dome light came on, and the officer saw marijuana near the gear shift. *Id.* It was only at this point that the officer told the driver he could not carry the firearm. *Id.* The district court denied the defendant's motion to suppress evidence obtained following the officer's entry into his car, and the defendant was convicted on all three charges. *Id.* at *3.

The court of appeals reversed the district court's denial of the defendant's motion to suppress on the basis that the officer violated the Fourth Amendment when he got into the defendant's car. *Id.* at *5. But, as the court of appeals noted, the suppressed evidence of the marijuana only affected the marijuana possession charge. *Id.* at *6. It did not affect the driving while barred charge or the section 724.8B charge. *Id.* The defendant's appeal of the section 724.8B charge relied only on the suppression motion because possessing an illegal controlled substance was the original basis for that charge and was the focus of the district court's analysis of the firearm charge. But, as the court of appeals noted in a footnote, driving while barred as a habitual offender—an aggravated misdemeanor and therefore an indictable offense—also supported the

section 724.8B conviction, *id.* at \*2 n.2, and the defendant had not challenged that separate basis for his conviction, *id.* at \*6.[3]

Does an individual who is barred from driving lose his constitutional right to carry a firearm when he then illegally drives to the corner convenience store, as Richter did? In my view, that depends on whether it could be said that carrying his firearm had the potential to facilitate the underlying crime of driving while barred, i.e., whether he carried it for an unlawful purpose. That case is not before us, and the resolution of that issue must await a constitutional challenge in a case that presents that issue. But the plurality's reasoning would foreclose us from even considering those very different circumstances.

Further, if the historical tradition applies only to law-abiding citizens, as the plurality suggests, there is no reasoned basis to stop at indictable offenses. The plurality's reasoning would extend as well to simple misdemeanors, such as speeding. Or jaywalking. If a defendant loses his constitutional right to carry a firearm for self-protection in public simply because he gets pulled over while keeping up with the speeding traffic flow or crosses the street mid-block, there is, as Justice McDermott's dissent aptly points out, little to the Second Amendment right.

There must be a nexus between the firearm and the criminal conduct before the plurality's underlying premise—that the fundamental constitutional right to carry a firearm for self-protection does not extend to carrying the firearm *for* an illegal purpose—kicks in.

---

[3]The defendant brought a Second Amendment challenge, but it was limited to the firearm prohibition that was included in the sentencing order related to the marijuana possession conviction. *Richter*, 2024 WL 960963, at \*1, \*6. The court of appeals' reversal of the possession conviction mooted the Second Amendment challenge. *Id.* at \*6.

III.

With this limitation in proper focus, I agree with the plurality that Woods's as-applied challenge to his conviction for carrying a firearm while possessing marijuana under Iowa Code section 724.8B fails because neither the Second Amendment nor article I, section 1A protects that conduct.

As the plurality rightly recognizes, section 724.8B is a conduct-based restriction, not a status-based one. It only prohibits carrying a firearm while engaging in specific conduct—here, while illegally possessing a controlled substance. This makes a difference when framing Woods's as-applied challenge. The burden rests with Woods to show that the Second Amendment or article I, section 1A protects his conduct of carrying a firearm while illegally possessing marijuana as prohibited by Iowa Code section 724.8B. *See United States v. Jackson*, 138 F.4th 1244, 1252 (10th Cir. 2025) (explaining that "[t]he inquiry at the first step of the *Bruen* test" includes determining "whether the proposed course of conduct falls within the Second Amendment" (quoting *Rocky Mountain Gun Owners*, 121 F.4th at 114)); *Rocky Mountain Gun Owners*, 121 F.4th at 113 ("[T]he [challenger] is tasked with establishing that the Second Amendment . . . encompasses the conduct they seek to engage in."); *United States v. Lehman*, 8 F.4th 754, 757 (8th Cir. 2021) ("[T]o succeed on [his] as-applied challenge, [the defendant] must establish . . . that the Second Amendment protects his particular conduct . . . ." (quoting *United States v. Adams*, 914 F.3d 602, 605 (8th Cir. 2019))); *see also United States v. Williams*, 113 F.4th 637, 662 (6th Cir. 2024) (rejecting defendant's Second Amendment challenge to 18 U.S.C. § 922(g)(1) because "in an as-applied challenge to § 922(g)(1), the burden rests on [the defendant] to show he's not dangerous. And he can't make that showing").

In considering Woods's as-applied challenge, we consider the particular facts of his conviction. *See Doss v. State*, 961 N.W.2d 701, 716 (Iowa 2021) (" '[A]n as-applied challenge alleges the statute is unconstitutional as applied to a particular set of facts' . . . ." (alteration in original) (quoting *Bonilla v. Iowa Bd. of Parole*, 930 N.W.2d 751, 764 (Iowa 2019))); *see also State v. Kieffer*, 17 N.W.3d 651, 665 (Iowa 2025) (describing the specific facts surrounding defendant's conviction for "domestic abuse assault impeding the flow of air or blood and domestic abuse assault causing injury after he hit and choked [the victim], leaving scratches on her neck and face, marks on her back and legs, a broken blood vessel in her eye, and a bloody lip" in assessing his as-applied Second Amendment challenge). Here, while driving to work in his company commercial truck, Woods carried a loaded firearm in a backpack that also contained his illegal (though presumably personal-use-quantity of) marijuana, a scale, and sixty-eight rounds of ammunition. The backpack was within his immediate reach on the center console of his company vehicle, alongside a THC vape pen. With this understanding of the facts, a review of cases addressing the interplay between firearms and illegal drugs helps address Woods's challenge.

"The analogues show a longstanding tradition of enhancing a defendant's sentence for the increased risk of violence created by mere possession of a firearm during the commission of certain crimes," and "[d]rug *trafficking* fits squarely within that category." *United States v. Alaniz,* 69 F.4th 1124, 1130 (9th Cir. 2023) (emphasis added) (rejecting Second Amendment challenge to sentencing enhancement under United States Sentencing Guideline § 2D1.1(b)(1) for possession of a firearm in connection with drug trafficking). I don't think the dissent would quarrel with this proposition. It is (or should be) beyond reproach that using a firearm to protect a drug dealer's illegal stash, or

his illegal drug operation generally, is not conduct that is protected by either the Second Amendment or article I, section 1A. *See United States v. Potter,* 630 F.3d 1260, 1261 (9th Cir. 2011) (per curiam) ("[I]t cannot seriously be contended that the Second Amendment guarantees a right to use a firearm in furtherance of drug trafficking." (emphasis omitted)); *Jackson,* 555 F.3d at 636 (recognizing *Heller*'s qualification of the Second Amendment right to "keep and bear arms for the purpose of *lawful* self-protection" and holding that the right does not extend to a drug dealer's "decision to operate an illegal home business," even if he did live in a dangerous neighborhood).

But the fact that this is a drug possession case, not a drug trafficking case, makes it a closer call than the plurality suggests. *See, e.g., United States v. Regans,* 125 F.3d 685, 686 (8th Cir. 1997) (discussing differences between drug trafficking and drug possession for personal use in addressing a firearm sentencing enhancement). As discussed, the core question in this case boils down to whether Woods has shown that his particular conduct falls within the protections of the Second Amendment or article I, section 1A, i.e., that he did not carry his firearm for an unlawful purpose.

On this point, the drug-possession-for-personal-use versus drug-possession-for-dealing distinction is not necessarily decisive on the question of a nexus (or lack of one) between carrying firearms and possessing illegal drugs. Even in the context of drug trafficking, for a firearm to be used "during and in relation to a drug trafficking crime" under 18 U.S.C. § 924(c)(1), "the gun at least must 'facilitat[e], or ha[ve] the potential of facilitating,' the [other] offense;" "its presence or involvement cannot be the result of accident or coincidence." *Smith v. United States*, 508 U.S. 223, 226, 238 (1993) (holding that exchanging a firearm for drugs could support a conviction for "using" a firearm

"during and in relation to a drug trafficking crime" (first and second alterations in original) (quoting *United States v. Stewart*, 779 F.2d 538, 540 (9th Cir. 1985), *overruled in part on other grounds by United States v. Hernandez*, 80 F.3d 1253, 1257 (9th Cir. 1996))).

Courts have focused on this same distinction between facilitation and coincidence or happenstance when considering whether a firearm was used "in connection with" a felony drug possession conviction for purposes of a federal sentencing enhancement. Two Eighth Circuit cases illustrate the distinction. In *United States v. Regans*, officers conducted a pat-down search of the passenger of a car stopped for a traffic violation who appeared to be concealing a weapon, and he was ultimately convicted in federal court of being a felon in possession of a firearm. 125 F.3d at 685. A search of his person at the police station uncovered .29 grams of heroin, which the defendant claimed was for personal use. *Id.* On appeal, the defendant challenged the four-level sentencing enhancement under United States Sentencing Guideline § 2K2.1(b)(5), which was based on his plea in state court to a felony drug possession charge stemming from the heroin possession. *Id.*

The Eighth Circuit noted the nexus between firearms and drug *trafficking*—where courts have repeatedly referred to "a firearm [a]s a 'tool of the trade' *for drug dealers*." *Id.* at 686 (emphasis added). Thus, "a 'weapon's physical proximity to narcotics may be sufficient to provide the nexus required between the weapon and the drug [dealing] charges.' " *Id.* (quoting *United States v. Johnson*, 60 F.3d 422, 423 (8th Cir. 1995) (per curiam), a case in which a drug dealer was arrested with a firearm, crack cocaine, and drug paraphernalia in his home). Despite the differences between dealing drugs and possessing drugs for personal use, the Eighth Circuit ultimately concluded that a sufficient nexus was

shown between the firearm and possession of a personal-use-quantity of illegal drugs in that case. *Id.* at 686–87. The court explained:

> The firearm may not be a 'tool of the trade,' because possession for use is not a 'trade' like drug trafficking. But when a drug user chooses to carry his illegal drugs out into public with a firearm, there are many ways in which the weapon can facilitate the drug offense and dangerously embolden the offender.

*Id.* Carrying a loaded firearm in close proximity to illegal drugs in public was not a mere happenstance.

The Eighth Circuit distinguished *Regans* in a subsequent case where a firearm was found near a personal-use-quantity of illegal drugs, but the drugs were in the defendant's home rather than out in public. *See United States v. Smith*, 535 F.3d 883, 885–86 (8th Cir. 2008).

> This case is distinguishable from *Regans* where the defendant was found in a car possessing a small amount of drugs for personal use and a firearm. The *Regans* court rejected the defendant's argument of coincidence, stating that "when a drug user chooses to carry his illegal drugs out into public with a firearm, there are many ways in which the weapon can facilitate the drug offense and dangerously embolden the offender." In our case, Smith did not venture into public with either the methamphetamine residue or the firearms; he simply possessed them in his home. This combination of factors makes an emboldenment theory impermissible in this case.

*Id.* (citation omitted) (quoting *Regans*, 125 F.3d at 687). These cases shed light on the specific facts that help determine whether or not carrying a loaded firearm in close proximity to even a personal-use-quantity of drugs is for an unlawful purpose.

As the Supreme Court has recognized, the potential for a firearm to facilitate the underlying criminal offense is sufficient to say it was used "during and in relation to [a] . . . drug trafficking crime" for purposes of federal law. *See Smith*, 508 U.S. at 238. This focus on the potential to facilitate is consistent with

historical restrictions. *See Bruen,* 597 U.S. at 56 ("[A]n individual's carrying of arms was 'sufficient cause to require him to give surety of the peace' only when 'attended with circumstances giving just reason to fear that *he purposes to make an unlawful use of them.*' " (emphasis added) (quoting Rawle 126)).

Given this understanding of the interplay between firearms and illegal drugs, the facts surrounding Woods's conviction are closer to *Regans* than to *Smith. Cf. People v. Gonzalez,* 291 Cal. Rptr. 3d 127, 132 (Ct. App. 2022) ("[I]t is reasonable to assume a person armed with a loaded, operable firearm . . . may be willing to resort to use of that weapon to avoid arrest and—in the case of section 11370.1, specifically—to maintain possession of their illicit stash."), *abrogated in part by Bruen,* 597 U.S. 1. In other words, the facts of this case do not suggest that Woods's conduct of carrying his loaded firearm in the same backpack as his illegal drugs was merely happenstance or coincidence. Woods has therefore failed to show that his conduct of carrying his readily accessible, loaded firearm out into public in the same backpack as his illegal drugs was protected by either the Second Amendment or article I, section 1A.

I agree with the plurality that Woods's as-applied constitutional challenge fails, and I join in the judgment.

**McDermott, Justice (dissenting).**

Both the Federal and State Constitutions preserve "the right of the people to keep and bear Arms." U.S. Const. amend. II; Iowa Const. art. I, § 1A. The restriction on Kevin Woods's right to bear arms in this case is attached to possession of a personal-use quantity of marijuana—a nonviolent misdemeanor offense. Although we accept a legislature's power to restrict the right to bear arms when it's imposed against people who are dangerous, in this case, the plurality upholds a firearm restriction even though the element of danger is absent.

Although the plurality repeatedly says that there's no right to carry a gun while committing a crime, the plurality offers nothing to convince the reader that simply possessing a personal-use amount of marijuana presents any semblance of danger to justify abridging Woods's right to bear arms. And if *any* crime—dangerous or not—will do to support a gun restriction, then restricting the right to bear arms when committing other nondangerous crimes gets the constitutional green light under the plurality's reasoning too.

But the constitutional right to bear arms is not so easily dispensed with. The plurality's failure to distinguish between dangerous and nondangerous activities leads it to uphold a firearm restriction that in this case has no anchor in our historical traditions. Because the plurality gets the analysis wrong under both the Second Amendment to the United States Constitution and article I, section 1A of the Iowa Constitution, I must respectfully dissent.

**I. Factual Background.**

Some expansion of the plurality's recitation of facts is necessary. Because Woods brings an "as applied" challenge—where we look to whether the particular

application of the challenged statute to him under the facts of this case deprived him of his constitutional right—the factual particulars are relevant to the analysis. *See Singer v. City of Orange City*, 15 N.W.3d 70, 76 (Iowa 2024).

When the trooper stopped the truck that Woods was driving to investigate a nonfunctioning taillight on the truck's trailer, it was just after 6:00 a.m. on a Tuesday morning in late July. The pickup's doors displayed company decals for a parking lot maintenance company based in nearby Carlisle. Woods, it appears, was simply driving to work in a work truck pulling a trailer.

In his initial visit to the driver's window, the trooper informed Woods about the reason for the stop. Woods was unaware of any problem with the trailer's lights, so the trooper walked with Woods to the rear of the trailer to show him. The trooper asked Woods for the registrations for the truck and trailer and, because the truck was a commercial vehicle, the annual vehicle inspection reports. Woods wasn't immediately able to locate the inspection reports, so he called his boss for help. Woods soon located some of the paperwork, provided it to the trooper, and returned to the truck. After reviewing the paperwork, the trooper began his own equipment inspection of the truck and trailer.

At some point, the trooper returned to the driver's window to return the paperwork. The officer reports that at this point, he detected the odor of marijuana. But the trooper didn't say anything about it. Instead, he continued with the equipment inspection. He walked around the vehicle to perform the inspection. He even asked Woods to assist with some inspection-related tasks, such as testing the parking brake.

While standing outside the passenger window during the inspection, the trooper looked inside and saw a THC vape pen in the truck's center console. A THC vape pen is a portable pen-shaped device used to vaporize and inhale THC,

the psychoactive ingredient in marijuana. The trooper took the vape pen, telling Woods it was illegal to possess one in Iowa or to have one in a commercial vehicle. He then informed Woods that he was going to search Woods's person and the truck for other contraband.

When the trooper asked Woods whether he had any other contraband, Woods responded that he had another vape pen in his pocket. After searching Woods's person and finding nothing else, the trooper began searching the truck. When the trooper was about to search a backpack inside the truck, Woods informed the trooper that the backpack contained marijuana and a firearm. In the backpack, the trooper found a pistol, three additional magazines (two full and one empty), a small cylindrical container containing some marijuana, and a scale. Although the record does not disclose the precise amount of marijuana in the container, it's undisputed that the amount was, at most, a personal-use quantity.

The State charged Woods with two counts: (1) possession of a controlled substance under Iowa Code § 124.401(5) (2023) and (2) being a person ineligible to carry a dangerous weapon under Iowa Code § 724.8B. Both charges are serious misdemeanors. Woods was separately charged with various commercial vehicle infractions that are not at issue here. Woods was never alleged to have been under the influence of THC or any other intoxicants on the morning in question. The trooper's report described Woods's condition as "sober."

Woods filed a motion to dismiss the second count, arguing that § 724.8B was unconstitutional under both the Second Amendment to the United States Constitution and article I, section 1A of the Iowa Constitution. The State resisted. The district court denied the motion. Woods thereafter pleaded guilty to both counts, but on the second count, he entered a conditional guilty plea to preserve

his right to appeal the denial of his motion to dismiss. As to count I, the district court fined Woods $430 and sentenced him to 180 days' imprisonment. As to count II, the district court again imposed a $430 fine and sentenced Woods to 365 days' imprisonment. The district court ordered both terms of imprisonment to run concurrently but then suspended both sentences. This appeal of Woods's conviction under the second count followed.

**II. The Restriction is Unconstitutional Under the Second Amendment.**

Woods argues that Iowa Code § 724.8B is an unconstitutional deprivation of his right to bear arms under both the Federal and Iowa Constitutions. Iowa Code § 724.8B criminalizes "carrying dangerous weapons" by (1) "[a] person determined to be ineligible to receive a permit to carry weapons," (2) "a person who illegally possesses a controlled substance included in chapter 124, subchapter II," or (3) "a person who is committing an indictable offense." The statute makes a violation of this section a serious misdemeanor.

Woods's conduct falls within two categories of the statute: illegally possessing a controlled substance and committing an indictable offense. An "indictable offense" is simply "an offense other than a simple misdemeanor." Iowa Code § 801.4(8). Simple misdemeanors include, for instance, speeding violations, *id.* § 321.285(8), underage possession of alcohol, *id.* § 123.47(2)(*b*), and disorderly conduct, *id.* § 723.4(1). An "indictable offense" thus includes other misdemeanors (specifically, "serious" and "aggravated" misdemeanors). *See id.* § 903.1. But since this is an as-applied challenge, and since Woods's possession of marijuana (a serious misdemeanor) constitutes the indictable offense in question, the focus necessarily centers on Woods's possession of marijuana. Although courts have found a historical tradition of disarming people who have committed felonies, as Justice Oxley elaborates in her opinion concurring in the

judgment, there appears to be little historical basis to disarm people who have committed nonviolent misdemeanors.

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *New York State Rifle & Pistol Ass'n v. Bruen*, the United States Supreme Court described a two-part inquiry for analyzing challenges to firearm regulations under the Second Amendment. 597 U.S. 1, 17 (2022). First, the challenger bears the burden of showing that "the Second Amendment's plain text covers an individual's conduct." *Id.* Once a challenger makes that showing, "the Constitution presumptively protects [his] conduct," and the burden shifts to the State to prove that the restriction "is consistent with this Nation's historical tradition of firearm regulation." *Id.* If the State fails to meet this burden, the restriction is unconstitutional. *See id.* at 30.

**A. "Plain text" Analysis Under the First Inquiry.** The plurality decides this case on the first part of the inquiry, concluding that marijuana possessors forfeit any Second Amendment rights. But it's not easy to get to the plurality's result through analysis of the plain text, as *Bruen*, 597 U.S. at 17, instructs. The text provides that the right to bear arms is held by "the people." U.S. Const. amend. II. The plurality instead asserts that the right to bear arms applies only to "an ordinary, law-abiding citizen," a reference made elsewhere in *Bruen*. 597 U.S. at 9. The plurality's approach short-circuits the "dangerousness" determination that generally falls within the second inquiry in *Bruen*'s two-part test. (More on this below.) Woods is not law-abiding because he possessed marijuana, the argument goes, and he thus cannot claim a Second Amendment right.

But the commission of a criminal act, without more, does not extinguish one's constitutional right to bear arms. The Second Amendment, like the Fourth Amendment, uses the phrase "right of the people." *Compare* U.S. Const. amend. II, *with id.* amend. IV. Both uses thus "unambiguously refer to individual rights." *District of Columbia v. Heller*, 554 U.S. 570, 579 (2008). In applying the Fourth Amendment, the right to be secure from unreasonable searches and seizures doesn't turn on whether a person has been engaging in a criminal act; even people engaged in crimes retain their search-and-seizure protections. *See McDonald v. United States*, 335 U.S. 451, 453 (1948) ("This guarantee of protection against unreasonable searches and seizures extends to the innocent and guilty alike."). "[C]onstruing the Second Amendment to apply only to [law-abiding] citizens is inconsistent with both *Heller* and the individualized nature of the right to keep and bear arms." *United States v. Williams*, 113 F.4th 637, 646 (6th Cir. 2024).

The State fails to offer a persuasive rationale to conclude that "the people" excludes marijuana possessors. "The people," the Supreme Court has said, "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580. Under the plain text of the Second Amendment, Woods is a "person" who, in carrying a firearm in his truck, was "bear[ing] Arms." U.S. Const. amend. II. And Woods—with or without marijuana in his backpack—is a member of the political community to whom the Second Amendment's text applies. Section 724.8B's restriction thus implicates Woods's Second Amendment right to bear arms. The plurality is wrong to stop after prong one. We thus move to *Bruen*'s second inquiry.

**B. Historical Traditions Analysis Under the Second Inquiry.** Under the second inquiry, we consider whether § 724.8B is consistent with this Nation's

history and tradition of firearm regulation as applied to Woods. "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n. 10 (1961)). Woods argues that no historical precedent exists to justify prohibiting someone who possesses a personal-use amount of marijuana from carrying a firearm.

The State bears the burden of showing that the challenged regulation is "relevantly similar" to restrictions that our nation has traditionally permitted. *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29). The State need not provide a "dead ringer" or "historical twin" to the challenged law. *Id.* (quoting *Bruen*, 597 U.S. at 30). A historical analogue is sufficient. *Id.* The challenged law and the historical law must share a common "why"—that they both address a comparable problem—and a common "how"—that they both place a similar burden on the person. *United States v. Connelly*, 117 F.4th 269, 274 (5th Cir. 2024) (citing *Rahimi*, 602 U.S. at 692).

First, we consider the "why" inquiry. As the State acknowledges, "founding-era legislatures did not regulate the possession, use, manufacturing, or trading of drugs like marijuana at all." Other courts have explained that the historical evidence shows "very little regulation of drugs (related to firearm possession or otherwise) until the late 19th century"—long after the Second Amendment's ratification. *Id.* at 279. The State thus does not present firearm restrictions tied to the use or possession of controlled substances as historical analogues for § 724.8B.

The State instead presents historical restrictions that prohibited firearm possession by groups deemed to be dangerous. It cites law review articles that

describe a seventeenth-century British law denying the right to bear arms based on religion or class; a Maryland law barring Catholics, slaves, or indentured servants from possessing firearms; "colonial gun laws" limiting access to firearms by Native Americans and slaves; and some Revolution-era laws prohibiting the possession of firearms by people who refused to declare an oath of loyalty. *See* Michael A. Bellesiles, *Gun Laws in Early America: The Regulation of Firearms Ownership, 1607–1794*, 16 Law & Hist. Rev. 567, 571–74, 578–79, 584–85 (1998). The unifying thread in each of these restrictions, the State argues, is the denial of the right to possess firearms to groups viewed as a danger to public safety.

To justify disarming a person for public safety reasons under the Second Amendment, the firearm restriction must address a material danger that the restricted person presents. *See United States v. Veasley*, 98 F.4th 906, 915–16 (8th Cir.), *cert. denied*, 145 S. Ct. 304 (2024). Again, § 724.8B disarmed Woods because he unlawfully possessed marijuana. In this case, whether the State has proved that the restriction satisfies *Bruen*'s historical test turns on whether Woods's possession of marijuana poses a danger to others.

Federal cases addressing challenges to a similar federal firearm restriction are instructive. That statute, 18 U.S.C. § 922(g)(3), prohibits anyone "who is an unlawful user of or addicted to any controlled substance" from possessing a "firearm or ammunition." In *United States v. Connelly*, the Fifth Circuit Court of Appeals considered an as-applied challenge to § 922(g)(3)'s restriction by a defendant who was a nonviolent marijuana user. 117 F.4th at 272. The Government offered several historical analogues for the firearm restriction, including (1) laws disarming the mentally ill, (2) laws disarming "dangerous" people, and (3) intoxication laws. *Id.* at 274–75.

The court reasoned "that marijuana intoxication is . . . most analogous to short-term mental impairment" but that the historical laws only disarmed the mentally ill while they were actually incapacitated. *Id.* at 275–76. The court thus found "no historical justification for disarming sober citizens not *presently* under an impairing influence." *Id.* at 276. Because the government had presented no evidence of some present impairment from marijuana use, the panel concluded that historical bans based on mental illness could not justify § 922(g)(3)'s ban on all users. *Id.*

Next, the court considered historical laws targeting "dangerous" groups, such as Catholics and colonists who refused to take an oath of loyalty. *Id.* at 277. The panel observed that these laws had "unique socio-political motivations" beyond merely protecting public safety. *Id.* at 278. "The Founders did not disarm English Loyalists because they were believed to lack self-control; it was because they were viewed as political threats to our nascent nation's integrity." *Id.* (citing Joseph G.S. Greenlee, *Disarming the Dangerous: The American Tradition of Firearm Prohibitions*, 16 Drexel L. Rev. 1, 60–63 (2024)). "So too with laws disarming religious minorities—the perceived threat was as political as it was religious, if not even more so." *Id.* Marijuana users, the *Connelly* court reasoned, are not dangerous because they present a risk of political or religious insurrection. *Id.* at 278–79. These laws thus did not establish a historical tradition protecting public safety to make them analogues to § 922(g)(3). *Id.*

Finally, the court considered historical laws barring the carrying of weapons while under the influence. *Id.* at 279–80. The court observed that these laws principally sought to maintain the sobriety of members of the armed services who might be called to duty since service members can't perform their duties (or can't perform them well) while intoxicated. *Id.* at 281. The court hit

upon no relevant Founding-era tradition or regulation that disarmed ordinary citizens who consumed alcohol, and it concluded that laws that came about much later were entitled to limited weight under the *Bruen* analysis. *Id.* at 281–82.

The *Connelly* court thus held in favor of the nonviolent marijuana user in her as-applied challenge to § 922(g)(3). *Id.* at 283. In rejecting each of the Government's proposed historical analogues for the firearm restriction, the court concluded that "[t]he analogical reasoning *Bruen* and *Rahimi 2024* prescribed cannot stretch that far." *Id.* at 282.

The statute challenged in this case, Iowa Code § 724.8B, addresses a *lesser* danger than the one targeted in 18 U.S.C. § 922(g)(3). Section 922(g)(3) bars possession by a marijuana user or addict—someone likely to be under the actual influence of the intoxicant. A law that prohibits someone actually under the influence of drugs from possessing a firearm presents a much closer case. But § 724.8B criminalizes the carrying of a firearm by someone merely *possessing* marijuana, even if the person is sober, as Woods was.

If a marijuana user is not considered dangerous unless they are under the actual influence of marijuana, there's no reason to conclude that someone who similarly is not actually under the influence of marijuana but merely *possesses* marijuana is somehow dangerous. Neither the State nor the plurality offers anything to suggest that a sober marijuana possessor presents a danger to public or officer safety. The question isn't whether recreational marijuana possession is unlawful; in Iowa, it is. (Under Iowa law, dispensaries are allowed to sell cannabidiol products that contain the active ingredients in marijuana—THC and CBD—for medicinal purposes. *See* Iowa Code § 124E.9.) The question is whether recreational marijuana possession presents a danger

consistent with our historical analogues to outlaw the carrying of a firearm while doing so.

The historical laws targeting "dangerous" groups that the State offers in this case are simply not relevantly similar. Whatever the danger Woods posed by possessing recreational marijuana, it has little in common with the insurrection-based justification offered for the Founding-era disarmament of groups based on religious, political, and class affiliations. The State "identifies no class of persons at the Founding who were 'dangerous' for reasons comparable to marijuana users." *Connelly*, 117 F.4th at 278; *see also United States v. Goins*, 118 F.4th 794, 805 (6th Cir. 2024) (Bush, J., concurring except for Sections III.A–B, and in the judgment) ("This history and tradition of disarming 'dangerous' political groups and religious minorities seems too far afield to provide supporting precedent for disarmament based on substance abuse, at least when, as here, the defendant has no history of violence through firearm misuse."). The State's proffered analogues thus fail to offer the same answer to *Bruen*'s "why" test. When a challenged regulation burdens the right to bear arms for different reasons than our historical laws, that difference in *why* the burdens were imposed points toward the modern regulation being unconstitutional. *Rahimi*, 602 U.S. at 692.

The plurality never explains the danger presented by someone merely possessing a personal-use amount of marijuana to justify § 724.8B's disarmament beyond a claim that the risk of danger intensifies *anytime* someone carries a firearm while unlawfully possessing a controlled substance. The plurality asserts that because people usually obtain illegal drugs from others, and firearms are often involved in drug transactions, drug possession always makes for a dangerous connection with firearms. But the conclusion we're asked

to draw from these loose premises in this case doesn't work. We know nothing about how Woods obtained the marijuana; the State, for its part, summoned no evidence on this point. Yet we do know that many states, including three states that border Iowa (Missouri, Illinois, and Minnesota), have legalized the sale of marijuana for recreational use. Woods easily could have lawfully purchased it from a dispensary in any of these states—without a firearm or the hint of any violence. The plurality's suggestion that possession of recreational marijuana necessarily entails an illegal drug transaction and is therefore dangerous fails to take into account the *lawful, peaceful* means now readily available for someone like Woods to obtain marijuana.

Again, although plenty of evidence supports the notion that carrying a firearm while *presently intoxicated* may present a danger, *see Connelly*, 117 F.4th at 282; *United States v. Harrison*, 654 F. Supp. 3d 1191, 1200–03 (W.D. Okla. 2023), and that carrying a firearm while engaging in *drug distribution* may present a danger, *United States v. Carter*, 802 F. Supp. 2d 180, 184 (D.D.C. 2011), the danger of carrying a firearm while simply possessing *a personal-use amount* of marijuana is never established.

The State cites no authority connecting the dots between someone possessing recreational marijuana and any risk of danger in carrying a firearm deriving from that mere possession. *See also United States v. Daniels*, 124 F.4th 967, 975 (5th Cir. 2025) (holding that § 922(g)(3) was unconstitutional as applied because the government "was not required to convince a jury that Daniels was presently or even regularly intoxicated at the time of arrest"). As the Eighth Circuit recently recognized in addressing an as-applied challenge to § 922(g)(3), attempts to justify firearm restrictions must fail when it is exceedingly unlikely that the restriction will prevent violence or terror from

happening. *See United States v. Cooper*, 127 F.4th 1092, 1096 (8th Cir. 2025). "[A]nalogues make clear that 'disarming *all* drug users,' regardless of the individual danger they pose, is not comparable to anything from around the time of the Founding." *Id.* at 1097 (quoting *Veasley*, 98 F.4th at 912). The same applies to Woods, who, by simply possessing a personal-use amount of marijuana, posed no danger.

We turn to the "how" inquiry, which requires us to examine how the historical regulation burdened the right to bear arms compared to the modern regulation. The State cites as analogues laws that increased the severity of punishment for certain crimes if the defendant possessed a weapon during the commission of the crime, offering a Massachusetts law from 1806, *see Commonwealth v. Hope*, 39 Mass. 1, 22 Pick. 1 (1839), and a Louisiana law from 1875, *see State v. Morris*, 27 La. Ann. 480 (1875). Both enhanced the penalty for burglary if the defendant was armed with a dangerous weapon. The State also cites a Sixth Circuit case that includes other examples of laws that applied enhancements to the degree of the underlying crime (for example, making a second-degree charge a first-degree charge) or to the crime's sentence when a defendant used a weapon while committing the underlying crime. *See United States v. Greeno*, 679 F.3d 510, 519 (6th Cir. 2012), *abrogated in part on other grounds by Bruen*, 597 U.S. 1.

But the plurality's enhancement argument misses an important feature of § 724.8B: it doesn't make carrying a firearm an *enhancement* to another crime but rather makes the carrying *itself* a separate crime. This is different than the Massachusetts and Louisiana laws that the State recites. The Massachusetts law did not prohibit anyone from possessing a firearm. Instead, it only affected punishment, stating that "if the person was armed with a dangerous weapon,

[the person] was punished by death; if not armed, by hard labor for life." *Hope*, 39 Mass. at 10, 22 Pick. at 7. Similarly, the Louisiana law provided that a defendant who committed a burglary with a dangerous weapon "shall suffer death." *Morris*, 27 La. Ann. at 481. But if a burglary was committed without a dangerous weapon, the punishment was "hard labor not exceeding fourteen years." *Id.* Under both the Massachusetts and Louisiana laws, a defendant could not be convicted based solely on their possession of a firearm. Instead, the firearm possession only came into play at sentencing, after the defendant was first convicted of committing burglary.

Section 724.8B is different. Again, it provides that "a person who illegally possesses a controlled substance . . . is prohibited from carrying dangerous weapons. Unless otherwise provided by law, a person who violates this section commits a serious misdemeanor." Iowa Code § 724.8B. It does not matter whether a defendant is actually charged with or convicted of the separate offense of possession of a controlled substance. Possession of a controlled substance is simply an element of the offense of unlawful carrying in § 724.8B. The statute does not, contrary to the plurality's assertion, provide an enhancement in sentencing or severity for any other crime.

The sentence imposed in this case makes this point clear. The district court in its sentencing order treated the convictions for the two counts separately. On the possession of marijuana charge (count I), the district court fined Woods $430 and sentenced him to 180 days' imprisonment. On the unlawful carrying charge (count II), the district court fined Woods $430 and sentenced him to 365 days' imprisonment. The district court ordered the two terms of imprisonment to run concurrently but then suspended both sentences.

A different drug statute not at issue in this case, Iowa Code § 124.401(1)(*e*), shows what an enhancement for carrying a firearm while possessing a controlled substance looks like. Iowa Code § 124.401(1) criminalizes the possession of a controlled substance with the intent to manufacture or deliver it. Subsection (1)(*e*) provides an enhancement to the crime, stating: "A person in the immediate possession or control of a firearm while participating in a violation of this subsection shall be sentenced to two times the term otherwise imposed by law, and no such judgment, sentence, or part thereof shall be deferred or suspended." Iowa Code § 124.401(1)(*e*). This is an example of an enhancement (albeit for drug distribution, not possession) akin to the historical examples the State offers; § 724.8B, by contrast, is not.

The State's enhancement argument thus fails *Bruen*'s "how" test—the historical statutes do not place a similar burden on firearm possession as § 724.8B. Under the "how" test, if historical laws "addressed the societal problem, but did so through materially different means," the difference in approach offers "evidence that a modern regulation is unconstitutional." *Veasley*, 98 F.4th at 911 (quoting *Bruen*, 597 U.S. at 26–27). Section 724.8B, with its creation of a separate crime for unlawful carrying independent of any other conviction, is not analogous to *how* our laws have traditionally burdened the right to bear arms. Contrary to the plurality's conclusion, this points further in the direction that § 724.8B is not "relevantly similar" to Founding-era laws.

The plurality's reliance on *State v. Brecunier*, 564 N.W.2d 365 (Iowa 1997), and *State v. Mehner*, 480 N.W.2d 872 (Iowa 1992), are unhelpful. We decided *Brecunier* twenty-five years, and *Mehner* thirty years, before the Supreme Court decided *Bruen*. Neither case considers the questions that *Bruen* asks courts to answer about whether the challenged restriction fits within "this Nation's

historical tradition." 597 U.S. at 17. Neither case discusses traditional firearm regulations nor engages in any historical analysis of Founding-era analogues. *See id.* In fact, the opinion in *Brecunier* expresses uncertainty about how the Second Amendment operates in general, stating that "[t]he law may be unsettled as to the precise scope of what rights the Second Amendment protects." 564 N.W.2d at 370. And we footnoted cases that suggest the Second Amendment might only apply to regulations that "would interfere with the preservation or efficiency of the militia." *Id.* at 370 n.4 (quoting *United States v. Hale*, 978 F.2d 1016, 1020 (8th Cir. 1992)). As we now know, the Supreme Court would establish a different analysis for challenges under the Second Amendment in the intervening decades. Suffice it to say the plurality's reliance on these pre-*Bruen* cases is misplaced.

Stated simply, the analogues that the State offers (and that the plurality relies on) "stray[] too far from the 'how and why' of 'historical regulations.' " *Cooper*, 127 F.4th at 1095 (quoting *Bruen*, 597 U.S. at 29). Section 724.8B is not "relevantly similar" to Founding-era laws. By restricting Woods's right to carry a firearm based on his mere possession of a personal-use amount of marijuana, § 724.8B inflicts "a far greater burden on [his] Second Amendment rights than our nation's history and tradition of firearms regulation can support." *Connelly*, 117 F.4th at 282. To steal a line from Judge Friendly, the State's proposed analogues are "so far away that resort to them would [be] rationalization rather than reasoning—the lines of force [are] too remote to exert any real pull." Henry J. Friendly, *Reactions of a Lawyer—Newly Become a Judge*, 71 Yale L.J. 218, 226 (1961). I would hold § 724.8B unconstitutional under the Second Amendment as applied to Woods.

**III. The Restriction is Unconstitutional Under Article I, Section 1A.**

The plurality also concludes that § 724.8B is constitutional under article I, section 1A (or "Amendment 1A") of the Iowa Constitution. Amendment 1A, like the Second Amendment, declares that "[t]he right of the people to keep and bear arms shall not be infringed." But Amendment 1A also provides that "[a]ny and all restrictions of this right shall be subject to strict scrutiny." So whereas the Second Amendment requires courts to analyze firearm restrictions under *Bruen*'s test, Amendment 1A requires courts to apply the familiar strict scrutiny test.

Strict scrutiny, both as a concept and an analytical tool, is well-established in our caselaw. It is the most exacting standard of constitutional review, placing "all the burden of justification on the State." *Planned Parenthood of the Heartland, Inc. v. Reynolds ex rel. State*, 975 N.W.2d 710, 731 (Iowa 2022). It requires the state to show that the challenged action is "narrowly tailored" to achieve "a compelling state interest" and requires the state to use "the least restrictive means" in doing so. *Mitchell County v. Zimmerman*, 810 N.W.2d 1, 16 (Iowa 2012).

The State argues that it has a compelling interest in preserving public and officer safety and that § 724.8B is narrowly tailored to achieve those interests. But showing that a statute offers the "least restrictive means" to achieve its aim is no easy task. Consider *Mitchell County v. Zimmerman*, 810 N.W.2d at 4. In that case, the plaintiff challenged a county ordinance that banned driving vehicles with wheels having steel cleats on paved roadways. *Id.* A member of the Mennonite Church, which forbids members from driving tractors without steel cleats, challenged the ordinance as a violation of his constitutional right to free exercise of his religion. *Id.* The county argued that the ordinance was necessary to protect hard-surfaced roads. *Id.* at 5. We held that the county failed to

establish that the ordinance was narrowly tailored to achieve the stated objective of road preservation because, among other reasons, "[a] more narrowly tailored alternative" to the county's ordinance "might allow steel wheels on county roads in some circumstances, while establishing an effective mechanism for recouping the costs of any necessary road repairs if damage occurs." *Id.* at 17.

In strict scrutiny analysis, if a less restrictive law would achieve the same compelling government interest, the more restrictive one fails the test. In this way, strict scrutiny, by design, cuts with a sharp blade. It's not hard to conceive of a less restrictive means to achieve the public- and officer-safety goal advanced in this case: Instead of making it a crime to carry a firearm while possessing a personal-use quantity of marijuana as § 724.8B does, the law might instead make it a crime to possess *distribution* quantities of marijuana. Although there's virtually no danger in simple possession of marijuana—a product that adults can now lawfully purchase in several states that border Iowa—there are well-recognized dangers associated with drug trafficking. *See, e.g., United States v. Jackson*, 782 F.3d 1006, 1008 (8th Cir. 2015) (describing the shooting death of a drug dealer while attempting to sell half a kilogram of cocaine); U.S. Sent'g Guidelines Manual § 2D1.1 cmt. 11(A), at 168 (U.S. Sent'g Comm'n 2024) (noting "the increased danger of violence when drug traffickers possess weapons"). This is why the overwhelming bulk of the cases that the plurality relies on address drug trafficking (often of "hard" drugs), not personal-use possession of marijuana. *See, e.g., United States v. Risner*, 129 F.4th 361, 364 (6th Cir. 2025) (involving a restriction prohibiting the use of a firearm during the commission of a drug trafficking crime and where the defendant admitted to possessing a firearm in connection with trafficking methamphetamine). Unlike drug

trafficking, carrying a firearm does nothing to *facilitate* the personal-use possession of marijuana.

But the plurality doesn't differentiate between the dangers present in trafficking and personal-use possession. Indeed, as mentioned, the plurality suggests that the "dangerousness" threshold is met any time a firearm might be present during *any* interaction with an officer pertaining to a violation of law. "There is no category of crime where the perpetrator's possession of a pistol during the commission of the crime makes the situation safer," the plurality declares, before suggesting that infractions resulting in traffic stops would be enough to justify a firearm restriction.

But if every crime that might result in an interaction with an officer presents a sufficient danger to justify a firearm restriction, then the right to bear arms becomes illusory. After all, people are subject to a dizzying array of criminal laws, many of them "reach[ing] far beyond what common sense and generally accepted moral principles would forbid." Edwin Meese III & Paul J. Larkin, Jr., *Reconsidering the Mistake of Law Defense*, 102 J. Crim. L. & Criminology 725, 734 (2012). People are subject to so many criminal laws that they routinely violate them—some estimates suggest as often as three times a day. *See generally* Harvey A. Silverglate, *Three Felonies A Day* (2009). Estimates suggest there are "over 300,000 different types of conduct that are prohibited either by statute or regulation in the federal system for which a person could be imprisoned and prosecuted as a criminal"—and this number doesn't include state criminal laws. Edwin Meese III, *Overcriminalization in Practice: Trends and Recent Controversies*, 8 Seton Hall Cir. Rev. 505, 510 (2012); *see also* Neil Gorsuch & Janie Nitze, *Over Ruled: The Human Toll of Too Much Law* 21 (2024) ("How many federal crimes do you think we have these days? It turns out no one

knows."). The sheer volume of criminal laws creates "a formidable task for the average person to know what the law forbids." Paul J. Larkin, Jr., *Public Choice Theory and Overcriminalization*, 36 Harv. J.L. & Pub. Pol'y 715, 720 (2013).

The constitutional right to bear arms becomes an empty promise if *any* criminal act that creates an interaction with law enforcement—regardless of the act's dangerousness—is enough to justify a firearm restriction. Speeding, failing to use a turn signal, driving with a malfunctioning taillight, fishing without a license—all are examples of crimes that might bring about an interaction with law enforcement. And despite the lack of danger inherent in any of them that might be enhanced by carrying a firearm, each would justify a firearm regulation under the plurality's reasoning.

Indeed, Congress has seemingly acknowledged that firearm restrictions associated with nondangerous crimes—even felonies—are unwarranted. In the Safe Streets Act of 1968 and the Gun Control Act of 1968, for instance, Congress limited a prohibition on convicted felons' possession of firearms by exempting certain nondangerous crimes, including felony offenses "pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." Pub. L. No. 90-351, 82 Stat. 197 (codified at 18 U.S.C. § 921(b)(3)); Pub. L. No. 90-618, 82 Stat. 1213, 1216 (codified at 18 U.S.C. § 921(a)(20)). Yet, unlike these federal statutes, the restriction in § 724.8B makes no differentiation between dangerous and nondangerous crimes.

The plurality also suggests that firearm regulations on the books when voters ratified Amendment 1A should survive a constitutional challenge because we can assume that voters were familiar with existing restrictions when they ratified the amendment. But as an initial matter, the record contains no evidence

of voters' knowledge about existing firearm restrictions when they voted for Amendment 1A, let alone what knowledge they might have had about § 724.8B. I am perplexed by the notion that we would presume voters knew every firearm restriction on the books when they voted on Amendment 1A. On the contrary, if we are going to speculate about voters' intentions, it's just as conceivable to me that voters ratifying Amendment 1A preferred instead to do away with all existing restrictions that violated the new amendment without some laborious statute-by-statute repeal. In this way, voters might have concluded that it was better to address existing restrictions through a single constitutional amendment. Regardless, we should not embrace the notion that every existing firearm restriction passes strict scrutiny based on the fiction that voters knew about and endorsed every such restriction in the Iowa Code's eight volumes. More to the point, voters' understanding of existing statutes simply can't do the analytical work that Amendment 1A requires regarding whether § 724.8B satisfies a strict scrutiny analysis.

When the "compelling interest" under our strict scrutiny analysis is public or officer safety, as it is here, then the key inquiry must be whether bearing a firearm heightens the *danger* that the underlying crime creates. Restricting carrying a firearm while possessing a personal-use amount marijuana simply doesn't meet this test. The plurality focuses on the fact that possession of marijuana is a crime but disregards any actual danger that the crime presents. In doing so, the plurality points its spotlight in the wrong place. If we're concerned about safety, it doesn't matter whether an act happens to violate a criminal statute; what matters is whether the act is dangerous. The element of danger in personal-use possession of marijuana is absent.

**IV. Conclusion.**

Under both the Second Amendment and Amendment 1A, the State failed to meet its different burdens to establish the constitutionality of § 724.8B. That statute, as applied in this case, abridged Woods's right to bear arms. I fear that the upshot from the plurality's opinion today, which in my view focuses too much on whether an act has been labeled a crime and not enough on whether that act is in fact dangerous, will not make communities or officers safer, but will only make it less likely that people will avail themselves of their constitutional right to bear arms.

Waterman and May, JJ., join this dissent.

#24–0261, *State v. Woods*

**May, Justice (dissenting).**

I respectfully dissent. I join Justice McDermott's well-reasoned opinion. I write separately to address Justice Oxley's thoughtful opinion concurring in the judgment. Although the concurrence makes many proper observations about the law and, indeed, identifies the correct rule for deciding this case, the concurrence's failure to correctly apply that rule leads to the wrong result.

As noted, I agree with many of the concurrence's points, including (1) its emphasis on the "fundamental" nature of our right to "keep and bear arms" under the Second Amendment and article 1, section 1A of the Iowa Constitution,[4] (2) its acknowledgement that some gun regulation is nevertheless allowable, and (3) its emphasis on the need for courts to identify "limiting principles" on gun regulation so we **"avoid obliterating"** the Second Amendment right. I also agree with the concurrence that—in this case—the appropriate limiting principle is whether or not the weapon is carried "*for* an unlawful purpose." And so the key question is this: Has the State shown that Woods carried the handgun at issue *for* an unlawful purpose?

But the concurrence does not answer that question. The concurrence does not explain whether Woods was carrying the gun "for an unlawful purpose" or not. His "purpose" is not identified.

Instead, the concurrence substitutes a "nexus" analysis that requires no inquiry into purpose. This nexus analysis asks only whether the firearm has "the potential to facilitate" a drug crime. This test is satisfied, the concurrence says, if the person possesses a firearm "in close proximity to illegal drugs" and the

---

[4]For ease of reference, I will refer to these state and federal protections together as the "Second Amendment."

person is in public. So, because Woods carried "his readily accessible, loaded firearm out into public in the same backpack as his illegal drugs," the test is satisfied, and Woods enjoys no Second Amendment protection.

I disagree. Again, as the concurrence says, the crucial question is whether Woods was carrying his gun "*for* an unlawful purpose." But the substituted nexus approach does not answer this question. Indeed, the nexus approach could justify punishing a citizen for carrying firearms **even when it is known** that the citizen has no "unlawful purpose" for carrying.

To illustrate how this could happen, consider the hypothetical person described in the State's brief: "the 80-year-old grandmother who uses marijuana for a chronic medical condition and keeps a pistol tucked away for her own safety." *See United States v. Veasley*, 98 F.4th 906, 917–18 (8th Cir. 2024). The State seems to assume—or, at least, I will assume—that this grandmother *does not* possess a firearm *for* an unlawful purpose. Rather, the gun is just to protect her against a violent world, a core justification for the Second Amendment right.

Even though she lacks an unlawful purpose for arming herself, the concurrence's approach would allow the grandmother to be jailed for arming herself. For instance, suppose she chooses to drive to Fareway to pick up baking supplies. Suppose also that she brings her purse with her, and that she always keeps her "pistol tucked away" in that purse "for her own safety." *Id.* at 918. Naturally, she keeps it loaded—so she can use the gun to protect her own safety. Finally, suppose that the purse also contains crumbs from her homemade marijuana brownies, the ones she uses "for a chronic medical condition." *Id.*

In that scenario, there would be no meaningful daylight between the grandmother's situation and Woods's. The grandmother's gun would be just as accessible—and, therefore, would have the same "potential to facilitate" a

crime—as Woods's handgun. Indeed, the facts of the two cases would be effectively identical because in both: (1) the gun is in a bag and loaded, (2) the marijuana is in the bag, (3) the gun is "readily-accessible," and (4) all of this occurs in public. And so, under the concurrence's nexus approach, the grandmother should be treated just like Woods. Even though we *know* (as part of the hypothetical) that the grandmother has no unlawful purpose for possessing the gun, she still lacks any constitutional right to carry, and she could still be sent to jail for doing so. Her lack of an unlawful purpose doesn't matter at all.

This is not the way. Instead, if the proper test is whether Woods was carrying "for an unlawful purpose," we should require the State to show that Woods was carrying "for an unlawful purpose." The concurrence would shift the burden of proof over to Woods, but that can't be correct. *Bruen* makes it clear that because Woods's conduct of carrying a firearm falls squarely within the Second Amendment's textual protection for keeping and bearing arms, "the Constitution presumptively protects that conduct." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). So it is the State's burden to justify any restriction on Woods's exercise of that constitutional right. One court has suggested that a case that the concurrence relies on for placing the burden on the defendant, *State v. Adams*, 914 F.3d 602, 605 (8th Cir. 2019), was abrogated by *Bruen* on this very point. *See United States v. Le*, 669 F. Supp. 3d 754, 756 (S.D. Iowa 2023) (discussing *Adams*, 914 F.3d 602). Nothing in *Bruen* suggests that Woods would need to prove that he *lacked* an unlawful purpose for exercising his textually guaranteed fundamental constitutional right to carry.

So, again, the question is whether the State has shown that Woods was carrying a gun "for an unlawful purpose." And on my review, I see no reason to conclude that the State has carried that burden. I agree with the concurrence that Woods wasn't engaged in drug dealing, much less carrying a gun for the purpose of drug dealing. Moreover, although he possessed marijuana unlawfully, I see no reason to conclude that he possessed the gun *for the purpose of* possessing the marijuana. Rather, as with the hypothetical grandmother, it seems just as likely that Woods had independent reasons for possessing each: the marijuana for recreation or similar uses, and the firearm for self-protection.

In any event, because the State hasn't shown that Woods was carrying the firearm "*for* an illegal purpose," the Second Amendment prevents him from being punished for doing so. I respectfully dissent.

Waterman and McDermott, JJ., join this dissent.